# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**STANDING ROCK SIOUX TRIBE,**

 **Plaintiff,**

 **and**

**CHEYENNE RIVER SIOUX TRIBE,**

 **Plaintiff-Intervenor,**

  **v.**

**U.S. ARMY CORPS OF ENGINEERS**

 **Defendant,**

 **and**

**DAKOTA ACCESS, LLC,**

 **Defendant-Intervenor and Cross-Claimant.**

</td><td>

**Civil Action No. 16-1534 (JEB)**

</td></tr>
</table>

## MEMORANDUM OPINION

Since last summer, the question of whether Dakota Access should route its oil pipeline near the reservations of American Indian tribes has engendered substantial debate both on the ground in North and South Dakota and here in Washington. This Court, meanwhile, has focused on the specific legal challenges raised by the Standing Rock and Cheyenne River Sioux Tribes in their efforts to block government permitting of the pipeline. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock I), 2016 WL 4734356 (D.D.C. Sept. 9, 2016).

At the start of 2017, that pipeline was nearly complete, save a stretch — awaiting an easement — that was designed to run under the bed of Lake Oahe, a federally regulated

waterway that forms part of the Missouri River and straddles North and South Dakota. Upon assuming office, President Trump directed an expedited approval process, and on February 8, the Army Corps of Engineers issued the easement that permitted Dakota Access to drill under the lake.

Fearing that the presence of oil in the pipeline under Lake Oahe will cause irreparable harm to its members' religious exercise, Cheyenne River responded with a Motion for Preliminary Injunction, in which it argues that the easement's grant violates the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, and requests that the Court enjoin the effect of the easement and thus the flow of oil, which is expected to commence in the next week or two. See ECF No. 156 (Status Report of Dakota Access, Mar. 6, 2017). As the Court concludes that the extraordinary relief requested is not appropriate in light of both the equitable doctrine of laches and the Tribe's unlikelihood of success on the merits, it will deny the Motion.

## I.    Background

The Dakota Access Pipeline (DAPL) is a domestic-oil pipeline designed to move more than half a million gallons of crude oil across four states every day. Standing Rock I, 2016 WL 4734356, at *1. Its construction has sparked legal challenges from several American Indian tribes: the Standing Rock and Cheyenne River Sioux Tribes here, as well as others. See Yankton Sioux Tribe v. U.S. Army Corps of Engineers, No. 16-1796 (D.D.C., filed Sept. 8, 2016); Oglala Sioux Tribe v. U.S. Army Corps of Engineers, No. 17-267 (D.D.C., filed Feb. 11, 2017). The present action originally sought, in principal part, to block permitting by the Corps of the construction and operation of DAPL underneath Lake Oahe, a federally regulated waterway created by the Corps in 1958 via a dam constructed on the Missouri River. Standing Rock I, 2016 WL 4734356, at *6. The Lake Oahe crossing sits about half a mile north of the Standing

Rock Reservation and 73 miles north of the Cheyenne River Reservation.  Id.; ECF No. 127-3, Exh. 1.  The crossing, which will run under the lakebed but not through the water itself, is the only portion of DAPL that is not yet finished.  See ECF No. 89-1 (Presidential Memorandum of Jan. 24, 2017), § 1; Preliminary Injunction Oral Argument Transcript (Feb. 28, 2017) at 9:22-10:2.

The Court has previously discussed the permitting schemes for construction activities in federally regulated waters and documented the Corps' application of those schemes to DAPL.  See Standing Rock I, 2016 WL 4734356, at *1-17.  It thus will recap only the developments relevant to the present Motion.

Dakota Access formally requested a permanent easement at Lake Oahe in October 2014, see ECF No. 73-4 at 2, and submitted an application for such an easement to the Corps in June 2015.  See ECF No. 73-5.  On July 25, 2016, the Corps granted permission under the Rivers and Harbors Act, 33 U.S.C. § 408, for DAPL's placement at Lake Oahe.  See ECF No. 73-7.  The parties disagree as to whether the Corps also at that time granted an easement pursuant to the Mineral Leasing Act, 30 U.S.C. § 185.  See ECF No. 57 (Dakota Access Cross-Claim); ECF No. 66 (Dakota Access Mot. for Summary Judgment); ECF No. 73 (Corps Mot. for Summary Judgment).  Two days later, the Standing Rock Sioux Tribe filed this suit against the Corps for declaratory and injunctive relief pursuant to the National Historic Preservation Act, National Environmental Policy Act, Clean Water Act, and the Rivers and Harbors Act.  See ECF No. 1 (Complaint), ¶¶ 128-212.  Dakota Access successfully moved to intervene in support of the Corps on August 5, see ECF No. 7, and Cheyenne River joined as a Plaintiff on August 10.  See ECF No. 11.  Cheyenne River then filed its own Complaint, see ECF No. 11-12, which it later amended on September 8.  See ECF No. 37.  Like Standing Rock's Complaint, Cheyenne

River's pleadings stated claims under the NHPA, NEPA, CWA, and RHA, as well as for breach of trust responsibility, and violations of the Flood Control Act and the Administrative Procedure Act. Id. at 38-55. Significantly, neither Plaintiff asserted a count under the Religious Freedom Restoration Act.

The Tribes initially sought a preliminary injunction — based solely on the NHPA — contending principally that the clearing and grading of land along the pipeline route desecrated sites sacred to them. On September 9, 2016, immediately after this Court issued its Opinion denying that motion, see Standing Rock I, 2016 WL 4734356, the Departments of Justice, the Interior, and the Army issued a joint statement explaining that because "important issues raised by the Standing Rock Sioux Tribe and other tribal nations and their members regarding the Dakota Access pipeline" remained, "construction of the pipeline on Army Corps land bordering or under Lake Oahe [would] not go forward" until the Army could determine whether reconsideration of any of its previous decisions regarding the Lake Oahe crossing under NEPA or other federal laws was necessary. See ECF No. 42-1 at 1.

Two months later, on November 14, 2016, Assistant Secretary of the Army for Civil Works Jo-Ellen Darcy wrote to Dakota Access and Standing Rock to explain that the Army had completed the review called for on September 9 and had "determined that additional discussion with the Standing Rock Sioux Tribe and analysis [were] warranted." ECF No. 56-1 at 2. The Army invited Standing Rock to engage in discussions concerning "[p]otential conditions in an easement for the pipeline crossing" and "[i]n light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed." Id.

Then, on December 4, Assistant Secretary Darcy issued a memorandum to the Corps' Commander stating that the Army would "not grant an easement to cross Lake Oahe at the

proposed location based on the current record." ECF No. 65-1, ¶ 12 (emphasis added). She directed a "robust consideration of reasonable alternatives," which she thought would be "best accomplished . . . by preparing an Environmental Impact Statement." Id. On January 18, 2017, Darcy published in the Federal Register a notice of intent to prepare an EIS. See 82 Fed. Reg. 5,543 (Jan. 18, 2017).

The government's position on the easement shifted significantly, however, once President Trump assumed office. A Presidential Memorandum issued on January 24, 2017, directed the Secretary of the Army to instruct the Assistant Secretary of the Army for Civil Works and the Corps "to take all actions necessary and appropriate to . . . review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approvals to construct and operate the DAPL, including easements or rights-of-way" and to "consider, to the extent permitted by law and as warranted, whether to rescind or modify" the December 4 memorandum. See ECF No. 89-1, § 2. The Army completed a review, see ECF No. 114-1 (Memorandum re: Dakota Access Pipeline; USACE Technical & Legal Review for the Dep't of the Army, Feb. 3, 2017), provided notice to Congress of its intent to issue the easement, see ECF No. 95, and did so on February 8. See ECF No. 96-1.

The next day, Cheyenne River filed the present Motion for Preliminary Injunction along with an Application for a Temporary Restraining Order. See ECF No. 99. The Tribe does not consistently describe the nature of the requested injunctive relief. At points, it asks that the Court direct the Corps "to withdraw the easement." Notice of Mot. at 1; ECF No. 98-12 (Text of Proposed PI Order) at 1. It elsewhere asks the Court to enjoin "the effect of the easement" and to enjoin further construction by Dakota Access "in the area described in the easement." Mot. at 1;

see also id. at 2, 3-4.  Because the impact of withdrawing the easement or suspending its effect would presumably be the same — halting any additional construction under and on either side of Lake Oahe and preventing the flow of oil — the Court need not parse the different terminology.

The sole cause of action raised in the TRO and this Motion is the Religious Freedom Restoration Act.  Id.; ECF No. 98 (Mot.).  Specifically, Cheyenne River contends:

> The Lakota people believe that the mere existence of a crude oil pipeline under the waters of Lake Oahe will desecrate those waters and render them unsuitable for use in their religious sacraments. . . . The Lakota people believe that the pipeline correlates with a terrible Black Snake prophesied to come into the Lakota homeland and cause destruction. . . .  The Lakota believe that the very existence of the Black Snake under their sacred waters in Lake Oahe will unbalance and desecrate the water and render it impossible for the Lakota to use that water in their Inipi ceremony.

Mot. at 2-3.  Because Cheyenne River had not previously pled a RFRA claim, it has also sought leave to file a Second Amended Complaint.  See ECF No. 97.  For purposes of resolving the present Motion, the Court assumes it will grant the Tribe's motion for leave to amend, such that the RFRA claim is properly before it.

The Court held a hearing on the TRO on February 13.  Finding that no harm to religious exercise was imminent, as oil was not yet set to flow through DAPL, the Court denied the application.  See Minute Order of Feb. 13, 2017; ECF No. 119 (TRO Oral Argument Transcript, Feb. 13, 2017) at 29:20-30:19.  It then set a compressed briefing schedule on the instant Motion for Preliminary Injunction and heard argument on February 28.  It issues this Opinion on an expedited basis.

## II.    Legal Standard

"[I]njunctive relief" is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555

U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is

likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

the public interest."  Id. at 20.

Before the Supreme Court's decision in Winter, courts weighed the preliminary-

injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a

strong showing on another.  See, e.g., Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-

61 (D.C. Cir. 1999).  This Circuit, however, has suggested that Winter should be read to abandon

the sliding-scale analysis in favor of a "more demanding burden" requiring plaintiffs to

independently demonstrate both a likelihood of success on the merits and irreparable harm.  See

Sherley v. Sebelius, 644 F.3d 388, 392-93 (D.C. Cir. 2011); Davis v. Pension Benefit Guar.

Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009).  Whether a sliding-scale analysis still exists or not,

courts in our Circuit have held that a failure to show a likelihood of success on the merits alone

is sufficient to defeat the motion.  Ark. Dairy Co-op Ass'n, Inc. v. USDA, 573 F.3d 815, 832

(D.C. Cir. 2009) (citing Apotex, Inc. v. FDA, 449 F.3d 1249, 1253 (D.C. Cir. 2006)).

III.    **Analysis**

Cheyenne River seeks preliminary-injunctive relief to protect its members' free exercise

of religion, which it argues will be compromised by the presence of crude oil in the Dakota

Access pipeline under Lake Oahe.  See TRO Tr. at 9:10-12, 11:3-4.  Because construction on

that portion of the pipeline is now underway and oil is likely to start flowing through the

completed pipeline in the next week or two, see DA Mar. 6 Status Report, the Tribe asserts that

its members' rights are in imminent danger.  It thus insists that the Court must enjoin the effect

of the easement — namely, Dakota Access's ability to operate the pipeline under Lake Oahe — while it weighs the merits of the Tribe's RFRA claim.

In response, the Corps and Dakota Access raise myriad arguments, among them that the Tribe has not demonstrated a likelihood of success on the merits both because its RFRA claim is barred by laches and because it failed to show a substantial burden on its members' religious exercise. The Court largely agrees, concluding that laches bars the preliminary-injunctive relief requested (but not the RFRA claim itself) and that the Tribe's substantial-burden position is unlikely to achieve success on the merits. Having so decided, the Court need not consider the remaining three factors of the preliminary-injunction analysis — irreparable harm, balance of equities, and public interest — or Defendants' other contentions.

A. Laches

Laches is an equitable defense "'designed to promote diligence and prevent enforcement of stale claims' by those who have 'slumber[ed] on their rights.'" Menominee Indian Tribe of Wisc. v. United States, 614 F.3d 519, 531 (D.C. Cir. 2010) (quoting Gull Airborne Instructions, Inc. v. Weinberger, 694 F.2d 838, 843 (D.C. Cir. 1982)). As a general matter, it applies "where there is (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Id. (quotation marks and citation omitted). How a court applies laches, however, turns on whether the relief requested is legal or equitable, whether the legislature has supplied a statute of limitations, and, if so, whether that limitations period has run. See Petrella v. Metro-Goldwin-Mayer, Inc., 134 S. Ct. 1962, 1973-74 (2014).

Where Congress has provided a statute of limitations and a plaintiff brings a claim for legal relief within the time period, laches cannot be invoked to preclude adjudication of the claim or to bar that type of relief. Id. at 1967, 1974. Where a plaintiff brings a claim for equitable

relief within the time period, conversely, "laches may bar at the very threshold the particular relief requested" only if "extraordinary circumstances" are present. Id. at 1967; 1977-78 (citing Chirco v. Crosswinds Communities, Inc., 474 F.3d 227 (6th Cir. 2007); New Era Publications Int'l v. Henry Holt & Co., 873 F.2d 576, 584-85 (2d Cir. 1989)). Absent such circumstances, a court may take account of the plaintiff's delay at the remedial stage when determining the appropriate injunctive relief. Id. at 1967; 1978-79.

RFRA is subject to a four-year statute of limitations. See 28 U.S.C. § 1658; see also Garraway v. Lappin, 2012 WL 959422, at *3 (M.D. Penn. Mar. 21, 2012); Al-Sadun v. DCFS, 2011 WL 1378638, at *3 (N.D. Ill. Apr. 11, 2011); Pineda-Morales v. De Rosa, 2005 WL 1607276, at *8 (D.N.J. July 6, 2005); Jama v. U.S. INS, 343 F. Supp. 2d 338, 365 (D.N.J. 2004). Defendants do not mention this statute or assert that extraordinary circumstances are present here. The Court, consequently, does not acquiesce in their position that laches bars the RFRA claim in its entirety. See DA Opp. at 1, 10; Corps Opp. at 10-15.

That conclusion, however, does not mean that laches is an irrelevant consideration here. On the contrary, a court assessing whether to award the "extraordinary remedy" of preliminary-injunctive relief, Winter, 555 U.S. at 22, may determine whether laches renders that relief inappropriate. See, e.g., Perry v. Judd, 840 F. Supp. 2d 945, 953-55 (E.D. Va. 2012) (discussing whether laches precluded preliminary-injunctive relief prior to undertaking four-factor analysis). The Court will thus proceed to analyze Defendants' contention that the Tribe delayed in filing suit on its RFRA claim and thereby caused them prejudice.

### 1. *Lack of Diligence*

Run-of-the-mill delay is not sufficient to warrant the application of laches. Menominee Indian Tribe, 614 F.3d at 531. The "party seeking relief" must have delayed "inexcusably or

unreasonably." Id. (quotation marks and citation omitted) (emphasis added).  As explained

below, although the Tribe learned of DAPL's proposed route in October 2014, when the Corps

solicited its input on the project, and the Corps issued some of the authorizations necessary for

Dakota Access to drill at Lake Oahe in July 2016, Cheyenne River waited until February 2017 to

voice its concern that, given the Black Snake prophecy, the mere presence of oil in the pipeline

would impose a substantial burden on its members' religious exercise and to seek to raise a

RFRA claim.

       In accordance with the consultation process required by Section 106 of the NHPA, the

Corps sent a letter to tribes, including Cheyenne River, on October 24, 2014, with information

about the proposed DAPL project and maps illustrating its location and nearby cultural sites.  See

ECF No. 127-5 (Declaration of Richard Harnois), ¶ 7.  The letter requested comments from the

Tribe within 30 days of its receipt.  Id.  Cheyenne River did not respond until March 23, 2015.

Id., ¶¶ 8-9, 12.

       Over the next several months, the Corps invited the Tribe to weigh in on DAPL,

including via site visits and meetings.  Id., ¶¶ 12-30.  Cheyenne River submitted comments in

person and via email, phone, and letter, id., ¶ 30, some of which alerted the Corps in general

terms that DAPL might affect sacred sites, including water.  But the Tribe never asserted that the

pipeline's operation itself under Lake Oahe — absent any spill or rupture — would somehow

compromise the purity of the water and pose a religious-exercise problem.  See, e.g., ECF No.

115-2, Exh. B (Letter from Steve Vance to Richard Harnois, Corps Sr. Field Archaeologist, Aug.

17, 2015) at 2 ("DAPL cannot address the [e]ffects to cultural and historical resources, Sacred

sites (water included), Traditional Cultural Properties, Properties of Cultural or Religious

Significan[ce] to Tribe, etc., of the proposed pipeline when they have not been properly

identified."); ECF No. 115-2, Exh. C (Federal Consultation with Tribes Regarding Infrastructure

Decision-Making, Oct. 27, 2016) at 145:15-17 ("Water is sacred to us."); Hanois Decl., ¶¶ 31-

33; ECF No. 143-1 (Transcript of NHPA Consultation Meeting, Feb. 18-19, 2016) at 3 (Steve

Vance, Cheyenne River's Tribal Historic Preservation Officer: "The water is the big thing.  You

know, we as tribes and Cheyenne River went on record and saying that water is a sacred object.

If you look at the sacred site policy and that it says 'other things', it [doesn't] say the water. . . .

And here we are[,] this is it.  I mean, when that's gone we're all hurting.").

 In August and September 2016, a few weeks after the Corps granted some of the

authorizations necessary for Dakota Access to drill under Lake Oahe, the Tribe filed its

Complaint and Amended Complaint.  In those pleadings, Cheyenne River continued to refer only

generally to water as religiously significant and to focus on the risk posed by spills or leaks and

the possible harm to sacred sites from clearing, grading, and construction activities.  See, e.g.,

ECF No. 11-12, ¶ 1 ("The construction and operation of the pipeline . . . will damage and destroy

sites of great historic, religious, and cultural significance to the Tribe."); id., ¶ 42 ("The Tribe is

greatly concerned with the possibility of oil spills and leaks from the pipeline should it be

constructed and operated, particularly into waters that are of considerable economic, religious,

and cultural importance to the Tribe."); id., ¶ 74 ("[T]he cultural and religious significance of

these waters cannot be overstated.  An oil spill from the pipeline into Lake Oahe would cause an

economic, public health and welfare, and cultural crisis of the greatest magnitude."); id., ¶ 76

("[T]he Lake Oahe crossing will take place in an area of great cultural, religious and spiritual

significance to the Tribe.  Construction of the pipeline . . . would destroy burial grounds, sacred

sites, and historically significant areas on either side of Lake Oahe."); ECF No. 37, ¶ 2 ("The

waters of the Missouri River . . . are sacred to the Lakota people of the Cheyenne River Sioux

Tribe and constitute the lifeblood of our religion and traditions."); ¶ 61 ("The waters of the Missouri River moreover are sacred to the Tribe and essential to the Tribe's practice of our religion.").

A declaration from the Tribe's Environmental Director/Research Specialist, filed in August 2016 with its motion to join Standing Rock's NHPA preliminary-injunction motion, likewise did not state that the mere presence of oil in a pipeline under the lake's floor would render the Tribe's members unable to perform religious ceremonies, nor did it mention the Black Snake. See ECF No. 19-6 (Declaration of Dave Nelson). Instead, it explained that "numerous . . . spiritual sites [exist] beneath the waters of the proposed DAPL pipeline crossing," that "[t]he water of the Missouri river and its tributaries is an essential component of many traditional Lakota cultural and spiritual practices" and is "used in numerous traditional ceremonies," and that construction of DAPL could harm the Tribe and its members because "the proposed use of explosives on the river bed . . . has a high likelihood of destroying or irreversibly damaging . . . spiritual sites," construction operations could destroy plants, and "due to the presence of historic pollutants . . . [,] construction and pipeline operation activities [could] contaminate the region's water in such a way that would negatively impact the Tribe's and its members' ability to conduct traditional medicinal and spiritual ceremonies and practices." Id., ¶¶ 5, 6, 9.

After the government announced in September 2016 that it intended to pause construction at the Lake Oahe crossing pending further review, Standing Rock explained in a letter to Assistant Secretary Darcy that "water itself plays a central role in the religious and cultural beliefs of the Tribe." ECF No. 115-4, Exh. D (Letter from Standing Rock Sioux Tribe to Jo-Ellen Darcy, Sept. 22, 2016) at 5. To support that contention, it quoted part of a declaration from Standing Rock's Chairman in which he discussed the risks to the Tribe's religious practice from

an oil spill: "Our Sundance, a spiritual ceremony sacred to us, is performed on the banks of the river.  [When a pipeline leaks into Lake Oahe], [t]he source of life, as well as spiritual continuity, would be damaged."  Id. at 6 (emphasis added) (alterations in original) (quoting ECF No. 6-1 (Declaration of Dave Archambault II, Aug. 4, 2016), ¶ 12).  (The unaltered declaration reads: "When the pipeline leaks, the Missouri river — the source of our drinking water, where we fish, swim, and conduct ceremonies — will be contaminated.  Our Sundance, a spiritual ceremony sacred to us, is performed on the banks of the river.  The source of life, as well as spiritual continuity, would be damaged.").  The letter then stated that "[t]he close connection between the waters of Lake Oahe and the religious practices of the Tribe implicate federal laws protecting Indian religious freedom," quoted language from the American Indian Religious Freedom Act and RFRA, and noted, "The Final EA does not mention these laws."  Id.

For more than two years after becoming aware of DAPL's proposed route, construction, and operation, then, Cheyenne River remained silent as to the Black Snake prophecy and its concerns about the presence of oil in the pipeline under Lake Oahe absent any issue of rupture, as well as about the possible applicability of RFRA.  In an effort to explain its delay, the Tribe argues that the Corps never engaged in proper consultations and that it was told by the Corps that the review process announced by Assistant Secretary Darcy on December 4, 2016, "would be the vehicle by which they could express their concerns and press their rights with the government." ECF No. 97 (Mot. to Amend Complaint) at 3; ECF No. 141 (Reply) at 3-4; TRO Tr. at 7:17-23.

This explanation is unsatisfactory.  In spite of an allegedly inadequate consultation process, the Tribe was still able to raise specific concerns about, for example, harm to water safety and burial sites, and to plead claims under the NHPA, NEPA, and other environmental statutes in its August and September filings.  It is not clear what prevented Cheyenne River from

also raising its specific religious-exercise concerns with the Corps or in its Complaints here.  The

Court, accordingly, concludes that Defendants have shown that the Tribe inexcusably delayed in

voicing its RFRA objection.

2. *Prejudice*

Defendants argue, moreover, that they have suffered prejudice from Cheyenne River's

unjustified delay because had they been made aware of the Tribe's specific religious objection to

the Lake Oahe crossing earlier, they could have considered whether and how to accommodate

this concern.  See ECF No. 127 (Corps Opp.) at 11; ECF No. 124 (DA Opp.) at 10-11.  The

Corps represented at oral argument on the instant Motion that had it known of the Tribe's beliefs

during the permitting process, rerouting the pipeline north of Lake Oahe could have been "one

possibility."  PI Tr. at 28:12-22.  Indeed, Defendants previously modified the pipeline workspace

and route more than a hundred times in response to cultural surveys and Tribes' concerns

regarding historic and cultural resources.  See Standing Rock I, 2016 WL 4734356, at *7, 13.

The Corps also imposed additional construction conditions on DAPL in response to tribal

positions regarding environmental safety.  Id. at *14.  Notably, such changes were made prior to

any litigation.

At this point, however, the Corps has granted the permits and easement, and DAPL's

construction under Lake Oahe is days from completion.  See DA Mar. 6 Status Report.

Suspending the effect of the easement now would undercut the purpose behind the consultation

obligations built into the Corps' permitting processes, which aim to surface tribal concerns in a

timely manner.  Such injunctive relief would also, by delaying the flow of oil, impose significant

costs on a private third party, Dakota Access.  And if the Tribe were ultimately to prevail on the

merits of its RFRA claim, rerouting the pipeline around Lake Oahe would be more costly and

complicated than it would have been months or years ago, as doing so now requires not simply changing plans but abandoning part of a near-complete project and redoing the construction elsewhere.  See, e.g., Daingerfield Island Protective Soc'y v. Lujan, 920 F.2d 32, 39 (D.C. Cir. 1990) (explaining whether relief sought "is still practicable" is a "crucial" consideration that "has turned on the degree to which construction is complete") (listing cases).

In asking the Court to grant a preliminary injunction suspending the effect of the easement and halting the construction and operation of the pipeline below Lake Oahe, Cheyenne River requests "an extraordinary and drastic remedy."  Munaf v. Green, 553 U.S. 674, 689 (2008) (citation omitted).  Although it does so within RFRA's four-year statute of limitations, the request comes long after Cheyenne River learned of the pipeline's proposed route, was invited to offer feedback, articulated other specific environmental and cultural issues, and filed suit on other claims.  Only once Dakota Access had built up to the water's edge and the Corps had granted the easement to proceed did Cheyenne River inform Defendants that the pipeline was the realization of a long-held prophecy about a Black Snake and that the mere presence of oil in the pipeline under the lakebed would interfere with the Tribe's members' ability to engage in important religious practices.  Because of the Plaintiff's delay in raising this religious-exercise objection and the negative impact of that delay on the Corps and Dakota Access, the Court concludes that the requested preliminary-injunctive relief is barred by laches.

B.  Likelihood of Success on the Merits

The Court also believes the Tribe has failed to demonstrate a likelihood of success on the merits of its RFRA claim.  Enacted in 1993, the Religious Freedom Restoration Act provides that the "Government shall not substantially burden a person's exercise of religion" unless "it demonstrates that application of the burden . . . (1) is in furtherance of a compelling

governmental interest; and (2) is the least restrictive means of furthering that compelling

governmental interest."  42 U.S.C. § 2000bb-1.  A person who brings a challenge under RFRA

bears the initial burden of proving that (1) the Government's policy or action implicates her

religious exercise, (2) the relevant religious exercise is grounded in a sincerely held religious

belief, and (3) the policy or action substantially burdens that exercise.  See Holt v. Hobbs, 135 S.

Ct. 853, 862 (2015) (discussing burdens in Religious Land Use and Institutionalized Persons Act

action); id. at 860 (explaining RLUIPA is governed by same standard as set forth in RFRA)

(citing Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)).  The

Court discusses whether the Tribe is likely to satisfy each of these initial three prongs in turn.  As

it answers this question in the negative, the Court need not look into whether the government

interest is compelling or if its action is the least restrictive means.

       1. *Implicates Religious Exercise*

Here, the religious exercise at issue is the performance of water-based ceremonies.

Cheyenne River is composed of four bands of the Lakota people, see Mot. at 4, who "believe

generally that water is sacred and that clean, pure water is an essential part of the Lakota way of

life."  Id. at 7.  Water plays a "specific, critical role in the practice of the Lakota sacred rites,"

including the Hanbleceya (vision-questing), Wiwanyan Wacipi (birth and renewal), Isnati

Awiciliwanpi (coming of age for young women), Wiping of the Tears (conclusion of mourning),

and Inipi (prayer and purification) ceremonies.  Id. at 7-8 (citing Declaration of Steve Vance

(Jan. 30, 2017), ¶ 11a).  According to Steve Vance, Cheyenne River's Tribal Historic

Preservation Officer, these ceremonies are an essential aspect of the Lakota religion; its

adherents "cannot practice [their] religion without [their] ceremonies."  Vance Decl., ¶ 11a.

Defendants do not dispute that these sacred rites constitute religious exercise. Instead, they argue that it is Dakota Access, not the government, whose actions implicate such exercise, thereby removing this case from the protections of RFRA. See DA Opp. at 14-16; Corps Opp. at 24-27. They rely for that argument on Village of Bensenville v. Federal Aviation Administration, 457 F.3d 52 (D.C. Cir. 2006), which considered whether RFRA required strict scrutiny of the FAA's approval of Chicago's plan to update and reconfigure O'Hare International Airport. Id. at 57. The plan involved relocating a church cemetery, and several individuals and entities sued the FAA, arguing that its approval violated RFRA. Id. The D.C. Circuit held that the Act did not apply because any burden caused by the City's plan was "not fairly attributable to the FAA." Id. "[C]onstitutional standards do not attach to conduct by third parties in which the federal government merely acquiesces," it explained. Id. There must be a "sufficiently close nexus between the [federal government] and the challenged action" of the third party "so that the action of the latter may be fairly treated as that of the [federal government] itself." Id. at 62 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)) (alterations in original).

Defendants contend that, as in Bensenville, Dakota Access's operating of the pipeline is the third-party conduct that burdens Cheyenne River's members' free exercise of religion, and the Corps' permitting is mere acquiescence. Whereas Bensenville involved "the government's regulation of a third party's use of the third party's land," however, this case involves "the government's use of its own land." Id. at 67. The Corps and Dakota Access argue that the opinion's logic regarding responsibility for the burden on religious exercise nonetheless applies here, see PI Tr. at 32:12-19, 49:19-50:4, but because the Court ultimately concludes that Cheyenne River is unlikely to succeed on the merits for other reasons, it need not resolve this

17

dispute. It therefore assumes without deciding that the Corps' action implicates the Tribe's religious exercise.

## 2. *Sincerely Held Religious Belief*

Cheyenne River's members believe that the water used in Lakota ceremonies, particularly the Inipi ceremony, must be "ritually pure." Mot. at 9; <u>see</u> Vance Decl., ¶ 16 (water must be "pure, natural," not "bottled" or "contaminated"); ECF No. 98-3 (Declaration of Marcella Gilbert), ¶ 6 ("Clean, undisturbed water is necessary in every ceremony."); ECF No. 98-4 (Declaration of Russ Cournoyer), ¶ 7 ("We cannot use . . . water that has been affected by artificial chemicals."); ECF No. 98-5 (Declaration of Ron Black Bird), ¶ 9 (same). Tribe members further believe that the mere presence of oil in the Dakota Access Pipeline will contaminate the lake's waters and render them unsuitable for use in their religious practices. <u>See</u> Vance Decl., ¶¶ 18-19; <u>see also</u> TRO Tr. at 9:9-12. According to Plaintiff, such desecration occurs whether or not the pipeline ruptures and the oil actually touches the water, and even though the pipeline itself never enters the lake's waters but instead runs under the lakebed. The existence of the oil <u>within</u> the pipeline under the lake is enough. <u>See</u> PI Tr. at 9:22-10:2.

In addition to the religious significance attaching to water generally, the Tribe ascribes particular meaning to the Missouri River, of which Lake Oahe is part. The Lakota chose to live near the Missouri "because of its importance to [their] existence." Vance Decl., ¶ 11; Mot. at 9-10. As "other bodies of water important in [their] culture were removed from [their access]" by the United States, "such as waters in the Black Hills," the Missouri took on even greater importance to the Tribe. <u>See</u> Vance Decl., ¶ 11. Vance states, "[The Missouri River] is important to our spirituality. It is an important source of our foods, medicines, water for

drinking, and for living.  It is the bloodline and the lifeline of the people at this time, and we cannot live without it."  Id.

The Tribe contends in its Motion, moreover, that its members "must rely on Lake Oahe exclusively . . . for the water they use in their religious ceremonies because Lake Oahe is the only source of natural, pure, uncontaminated water available to the people of the Cheyenne River Sioux Reservation."  Mot. at 13; see also Vance Decl., ¶¶ 15-16.  The Lakota also contend that they "own . . . these waters that comprise Lake Oahe," and so "believe that the existence of this crude oil pipeline under the Lake Oahe Reservoir poses a special threat to the way [they] practice [their] religion."  Vance Decl., ¶ 18.

As the Corps and Dakota Access note, Lake Oahe is not untouched by manmade projects. See DA Opp. at 28; Corps Opp. at 4.  DAPL's crossing, for instance, runs parallel, at a distance of 22 to 300 feet, to a natural-gas pipeline that was built under the lake in 1982.  Standing Rock I, 2016 WL 4734356, at *7, 26.  It also tracks an already existing overhead utility line.  Id. at *7. Several other oil pipelines cross the Missouri River upstream of Lake Oahe, including one located just 7.5 miles north of the lake (44 miles north of the DAPL crossing).  See Corps Opp. at 5; ECF No. 127-3, Exh. 1.  In addition, three vehicle bridges and one railroad bridge cross over Lake Oahe at locations closer to the Cheyenne River Reservation than the DAPL crossing, which is 73 miles away.  See ECF No. 127-3, Exh. 1.  And a wastewater-treatment plant is authorized to discharge into a tributary to a river that flows through the Reservation into Lake Oahe.  See Corps Opp. at 5 (citing City of Eagle Butte NPDES Permit (Sept. 30, 2011), https://www.epa.gov/region8/city-eagle-butte-npdes-permit).

The Tribe acknowledges the presence of the natural-gas pipeline under Lake Oahe but explains that it does not believe that that pipeline burdens its religious practice.  See Mot. at 43.

19

The difference between the natural-gas pipeline and DAPL is that the Tribe believes that the crude oil that is proposed to flow through the latter is the fulfillment of a Lakota prophecy of "a Black Snake that would be coiled in the Tribe's homeland and which would harm . . . [and] devour the people."  Mot. at 19; see also Vance Decl., ¶ 18.  According to Vance, the oil in DAPL, like the Black Snake, "is black, it is slippery, and it moves."  Id.  As to the other oil pipelines upstream of Lake Oahe, Cheyenne River asserts that only Lake Oahe constitutes its "area of concern."  TRO Tr. at 14:24; see also id. at 15:3-5 ("[W]e're not concerned about oil pipelines that may be somewhere above outside of waters that we own in Lake Oahe.").

The record is not clear whether the Black Snake prophecy was made before or after Lake Oahe was created nearly 60 years ago.  The Tribe's brief contends that "Lakota religious adherents now in their 50s and 60s were warned of the Black Snake by their elders as children," Mot. at 19; see also id. at 28, and Vance states that the prophecy was made "[l]ong ago."  Vance Decl., ¶ 18.  Presumably, the prophecy was issued after Lake Oahe was created; otherwise, the presence of pipelines upstream of the lake, including one that crosses 7.5 miles to its north, would be hard to reconcile with the Tribe's belief that DAPL alone is the Black Snake.  See TRO Tr. 15:3-5.

"To qualify for RFRA's protection, an asserted belief must be 'sincere,'" not pretextual.  Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2774 n.28 (2014).  Courts generally handle "the sincerity inquiry . . . with a light touch, or 'judicial shyness.'"  Moussazadeh v. Tex. Dep't of Criminal Justice, 703 F.3d 781, 792 (5th Cir. 2012); see also Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); Kay v. Bemis, 500 F.3d 1214, 1219 (10th Cir. 2007)

("The inquiry into the sincerity of a free-exercise plaintiff's religious beliefs is almost

exclusively a credibility assessment.") (citation omitted).  In light of instructions to tread gently

with its sincerity inquiry, therefore, the Court finds that the Tribe is likely to successfully

establish a sincerely held belief that the presence of oil in the Dakota Access pipeline running

under Lake Oahe interferes with its members' religious ceremonies.

Having so concluded, the Court now proceeds to consider whether the Tribe is likely to

satisfy the third of its *prima facie* RFRA obligations: a substantial burden on its religious

exercise.

### 3.  *Substantial Burden*

RFRA does not define "substantial burden," and the Supreme Court has not articulated a

precise definition.  This Circuit, however, has stated that "[a] substantial burden exists when

government action puts 'substantial pressure on an adherent to modify his behavior and to violate

his beliefs.'"  Kaemmerling v. Lappin, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting Thomas v.

Review Bd., 450 U.S. 707, 718 (1981)).  It offered Sherbert v. Verner, 374 U.S. 398 (1963), as

an example of such substantial pressure.  That case involved "the denial of unemployment

benefits to a Sabbatarian who could not find suitable non-Saturday employment," which "forced

her 'to choose between following the precepts of her religion and forfeiting benefits, on the one

hand, and abandoning one of the precepts of her religion in order to accept work, on the other

hand.'"  Kaemmerling, 553 F.3d at 678 (quoting Sherbert, 374 U.S. at 404).

Using that test, the Circuit rejected Kaemmerling's RFRA claim.  The plaintiff, a federal

prisoner, objected on religious grounds to the government's extracting DNA information from a

fluid or tissue sample taken from him by the Bureau of Prisons.  Id. at 673, 678-79.  The Circuit

concluded that he had failed to allege facts sufficient to state a substantial burden cognizable

under RFRA because the government's actions did not "'pressure [him] to modify his behavior and to violate his beliefs'" or require him to choose "between criminal sanction and personally violating his own religious beliefs." Id. at 679-80 (quoting Thomas v. Review Bd., 450 U.S. 707, 718 (1981)).

The government action here — i.e., granting the easement to Dakota Access and thereby enabling the flow of oil beneath Lake Oahe — does not impose a sanction on the Tribe's members for exercising their religious beliefs, nor does it pressure them to choose between religious exercise and the receipt of government benefits. Cheyenne River argues that whether it has been subjected to such sanction or pressure is irrelevant, see Reply at 14-16, and contends instead that it is sufficient for purposes of showing substantial burden that the effect of the government's action is to prevent the Tribe's members from performing required religious sacraments at Lake Oahe. See Mot. at 30-31; Reply at 14. That argument, however, is directly at odds with Supreme Court precedent.

Lyng v. Northwest Indian Cemetery Protective Association, 485 U.S. 439 (1988), was a case concerning an American Indian tribe's Free Exercise challenge to federal government actions involving sacred sites on federal land. The Supreme Court held that the incidental effect on religious exercise of a government action undertaken in furtherance of the management and use of government land, even if extreme, is not alone enough to give rise to a Free Exercise claim. That decision leads this Court to conclude that Cheyenne River is unlikely to establish that the Corps' grant of the easement imposes a substantial burden on its religious exercise such that it will succeed on the merits of its RFRA claim.

a.  The Force of <u>Lyng</u>

In <u>Lyng</u>, "an Indian organization, individual Indians, nature organizations and individual members of those organizations, and the State of California" challenged under the Free Exercise Clause the United States Forest Service's decision to build a six-mile segment of paved road and permit significant timber harvesting in a government-owned area considered sacred by several tribes. <u>Id.</u> at 442-43.  The plaintiffs contended that the "disruption of the natural environment caused by the . . . road will diminish the sacredness of the area in question" and interfere with tribal members' use of sites there for religious practice.  <u>Id.</u> at 448.

The Supreme Court acknowledged that the Forest Service's decisions "would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs." <u>Id.</u> at 449.  Indeed, it explained that it had "no reason to doubt[] that the logging and road-building projects at issue . . . could have devastating effects on traditional Indian religious practices," including their inability "to conduct a wide variety of specific rituals that aim to accomplish their religious goals." <u>Id.</u> at 451.  But the Court nonetheless concluded that the government's actions did not cause the kind of harm cognizable under the Free Exercise Clause because they did not "coerce[]" the affected individuals "into violating their religious beliefs" or "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." <u>Id.</u> at 449.  Ultimately, the Court explained, these harms were "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs." <u>Id.</u> at 450.  "Whatever may be the exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs, the location of the line cannot depend on measuring the effects of

a governmental action on a religious objector's spiritual development," even where the effect on religious practice is "extremely grave." Id. at 451.

As should be evident from the language it used to discuss the impact on the tribe's religious exercise — *e.g.*, "devastating" and "extremely grave," id. at 451 — the Supreme Court was not unsympathetic to the plight of the affected individuals. Id. at 456. And it cautioned that "[n]othing in [its] opinion should be read to encourage governmental insensitivity to the religious needs of any citizen" or to dissuade the government from accommodating religious practices. Id. at 453. But the effects of the Forest Service's actions simply did not raise a constitutional concern: "However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires." Id. at 452. "[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." Id. at 451 (quoting Sherbert, 374 U.S. at 412 (Douglas, J., concurring)).

Cheyenne River's religious-exercise claim is much like the one at issue in Lyng. It involves a government action — granting an easement to Dakota Access to build and operate a pipeline — regarding the use of federal land —the land under Lake Oahe, as discussed *infra* — that has an incidental, if serious, impact on a tribe's ability to practice its religion because of spiritual desecration of a sacred site. Just as the government's tree cutting and road building in Lyng did not give rise to an actionable Free Exercise claim, neither does its easement granting here likely violate RFRA.

That Lyng was a Free Exercise, rather than a RFRA, case does not change its applicability here. RFRA was enacted in response to the Court's decision in Employment Division v. Smith, 494 U.S. 872 (1990), which rejected, in certain circumstances, the Free

Exercise test employed in cases like <u>Sherbert</u> and <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972).

Those cases "used a balancing test that took into account whether the challenged action imposed

a substantial burden on the practice of religion, and if it did, whether it was needed to serve a

compelling government interest." <u>Hobby Lobby</u>, 134 S. Ct. at 2760. <u>Smith</u> held instead that

"neutral, generally applicable laws may be applied to religious practices even when not

supported by a compelling governmental interest." <u>Id.</u> at 2761 (quoting <u>City of Boerne v. Flores</u>,

521 U.S. 507, 514 (1997)). In enacting RFRA, Congress restored the compelling-interest test set

forth in pre-<u>Smith</u> cases. <u>See</u> 42 U.S.C. § 2000bb.

 <u>Lyng</u> is a pre-<u>Smith</u> case. When drafting and debating RFRA, Congress expressly noted

that RFRA did not undermine <u>Lyng</u>. The Senate Committee Report on RFRA explained:

> The committee expects that courts will look to free exercise cases
> decided prior to <u>Smith</u> for guidance in determining whether the
> exercise of religion has been substantially burdened . . . . And, while
> the committee expresses neither approval nor disapproval of that
> case law, pre-<u>Smith</u> case law makes it clear that <u>strict scrutiny does</u>
> <u>not apply to government actions involving only management of</u>
> <u>internal Government affairs or the use of the Government's own</u>
> <u>property or resources.</u>

S. Rep. No. 103-111 at 8-9 (1993) (emphasis added).

 As an example of a case falling into the latter category, the Report cited <u>Lyng</u> and recited

its holding "that the construction of mining or timber roads over public lands which were sacred

to the Native American religion did not constitute a burden on the Native Americans' free

exercise rights triggering the compelling interest test." <u>Id.</u> at 9 n.19. Although RFRA "is not a

codification of the result reached in any prior free exercise decision," the Committee continued,

it is "the restoration of the legal standard that was applied in those decisions." <u>Id.</u> at 9; <u>see also</u>

139 Cong. Rec. S14461, at S14470 (Statement of Sen. Orrin Hatch, Oct. 27, 1993) (RFRA "does

not effect [<em>sic</em>] <u>Lyng</u> . . . , a case concerning the use and management of government resources,

because . . . the incidental impact on a religious practice does not 'burden' anyone's free exercise

of religion.  In <u>Lyng</u>, the court ruled that the way in which government manages its affairs and

uses its own property does not impose a burden on religious exercise.").

Several circuit courts, including the D.C. Circuit, have cited <u>Lyng</u> approvingly when

resolving a RFRA or RLUIPA claim.  <u>See, e.g.</u>, <u>Priests for Life v. U.S. Dep't of Health & Hum.</u>

<u>Servs.</u>, 772 F.3d 229, 246, 248 (D.C. Cir. 2014), <u>vacated and remanded by</u> <u>Zubik v. Buwell</u>, 136

S. Ct. 1557 (2016); <u>Eternal World Television Network, Inc. v. Sec'y of U.S. Dep't of Health &</u>

<u>Hum. Servs.</u>, 818 F.3d 1122, 1146 (11th Cir. 2016); <u>Yellowbear v. Lampert</u>, 741 F.3d 48, 55

(10th Cir. 2014); <u>Westchester Day Sch. v. Village of Mamaroneck</u>, 504 F.3d 338, 349-50 (2d

Cir. 2007).  One such decision is particularly applicable to this case.

In <u>Navajo Nation v. U.S. Forest Service</u>, 535 F.3d 1058 (9th Cir. 2008) (*en banc*), a tribe

challenged the federal government's approval of the use of artificial snow on a mountain the

tribe considered sacred.  It asserted that the use of ersatz precipitation would "spiritually

contaminate the entire mountain and devalue their religious exercises."  <u>Id.</u> at 1063.  Relying

heavily on <u>Lyng</u>, the Ninth Circuit held that the government's decision to permit artificial snow

did not impose a substantial burden under RFRA because it did not force the tribe to choose

between exercising their religion and receiving a government benefit, nor did it coerce them to

act contrary to their religion under threat of civil or criminal sanction.  <u>Id.</u> at 1071-73.  The "sole

effect" was on their "subjective spiritual experience" — *i.e.*, "the presence of the artificial snow

on the Peaks is offensive to the Plaintiffs' feelings about their religion and will decrease the

spiritual fulfillment Plaintiffs get from practicing their religion on the mountain."  <u>Id.</u> at 1063.

"[U]nder Supreme Court precedent," the court explained, "the diminishment of spiritual

fulfillment — serious though it may be — is not a 'substantial burden' on the free exercise of

religion." Id. at 1070.  In so concluding, the Ninth Circuit echoed the prudential concerns

discussed in Lyng:

> Were it otherwise, any action the federal government were to take,
> including action on its own land, would be subject to the
> personalized oversight of millions of citizens.  Each citizen would
> hold an individual veto to prohibit the government action solely
> because it offends his religious beliefs, sensibilities, or tastes, or
> fails to satisfy his religious desires. . . .  No matter how much we
> might wish the government to conform its conduct to our religious
> preferences, act in ways that do not offend our religious sensibilities,
> and take no action that decreases our spiritual fulfillment, no
> government — let alone a government that presides over a nation
> with as many religions as the United States of America — could
> function were it required to do so.

Id. at 1063-64 (citing Lyng, 485 U.S. at 452); see also Snoqualmie Indian Tribe v. Fed. Energy

Regulatory Comm'n, 545 F.3d 1207, 1214-15 (9th Cir. 2008) (rejecting tribe's argument that

FERC's decision to relicense hydroelectric dam at sacred site imposed substantial burden on

religious exercise).

Just as the Ninth Circuit and other courts must follow Lyng until the Supreme Court

instructs otherwise, this Court must do the same.

> b.  Cheyenne River's Rebuttal

Cheyenne River offers several arguments as to why Lyng and Navajo Nation do not

apply to the present case or are no longer good law.  First, the Tribe attempts to distinguish those

cases by arguing that the facts here are distinct and that its members are more analogous to

prisoners than the plaintiffs in Lyng and its Ninth Circuit progeny are.  Second, Plaintiff

contends that recent Supreme Court decisions — Hobby Lobby and Holt — lessen Lyng's force.

Third, the Tribe asserts that its property interest in Lake Oahe dictates a different outcome from

Lyng.  None of these arguments is persuasive.

27

i.  Factual Differences

The Tribe first posits that this case is factually distinct from <u>Navajo Nation</u> and its progeny because "although a kind of spiritual contamination was alleged, the [federal] regulations at issue did not foreclose religious adherents' ability to practice any part of their religion."  Mot. at 33.  Instead, "plaintiffs were left other options to practice the rites at issue." <u>Id.</u>  The daylight between those cases and this one, in fact, is more limited than Cheyenne River suggests.  In <u>Navajo Nation</u>, the Ninth Circuit concluded that <u>Lyng</u> would have compelled it to reach the same result even if it had assumed that the use of artificial snow would "virtually destroy the . . . Indians' ability to practice their religion."  535 F.3d at 1072 (quoting <u>Lyng</u>, 485 U.S. at 451).

Relatedly, the Tribe also asserts that "unlike the plaintiffs in <u>Navajo Nation</u>, <u>Snoqualmie</u>, and <u>Lyng</u>, the resource that the Corps' action is proposed to burden is the only one available to the Cheyenne River Sioux Tribe to practice its religion as the United States has systematically deprived the Tribe of access to other water sources as a function of its more than 200-yearlong campaign to dispossess the Lakota people of their aboriginal lands and resources."  Mot. at 34.  Consequently, Cheyenne River argues, "the Tribe and its members here are more closely analogous to the prisoners whose only options in the exercise of their religion are closely controlled by the government."  <u>Id.</u>

The Court readily recognizes the sordid chronicle of the United States' dispossessing the Lakota people of swaths of land, <u>see, e.g.</u>, <u>United States v. Sioux Nation</u>, 448 U.S. 371 (1980); <u>Cobell v. Norton</u>, 240 F.3d 1081, 1086 (D.C. Cir. 2001), and takes seriously that the Tribe feels such deep oppression as to warrant analogy to the prisoner cases.  Yet <u>Lyng</u> expressly cautions that "measuring the effects of a governmental action on a religious objector's spiritual

28

development" is not the proper inquiry when the challenged action is the federal government's

management of its own land.  See 485 U.S. at 451.

　　　The RLUIPA cases on which the Tribe relies, furthermore, offer little succor.  Not only

have inmates suffered a total loss of liberty, whereas the Tribe's members have not, but the cases

cited involved either a specific prohibition on a particular form of religious exercise or the

imposition of a sanction or other collateral, non-religious harm in response to religious exercise.

See, e.g., Native Am. Council of Tribes v. Weber, 750 F.3d 742 (8th Cir. 2014) (total ban on

tobacco use in prisons, including during Native American religious ceremonies, violated

RLUIPA); Yellowbear, 741 F.3d at 55-56 (prison's refusal to permit inmate housed in special

protective unit access to sweat lodge in general prison yard imposed substantial burden); Haight

v. Thompson, 763 F.3d 554, 564-65 (6th Cir. 2014) (prison's decision to totally bar certain

traditional foods at powwow imposed substantial burden); Holt, 135 S. Ct. at 862 (grooming

policy prohibiting beards imposed substantial burden on Muslim inmate because he "face[d]

serious disciplinary action" for contravening policy); Williams v. Wilkinson, 645 Fed. Appx.

692, 702 (10th Cir. 2016) ("[T]he failure to provide Mr. Williams with a kosher diet will either

prevent him from exercising his sincerely held religious belief or force him to make the

Hobson's choice of eating a diet contrary to his beliefs or not eating at all."); Love v. Reed, 216

F.3d 682, 689-90 (8th Cir. 2000) (A choice "between fasting and compromising his religious

convictions[] is really no choice at all.").

　　　Here, although the Tribe's members may feel unable to use the water from Lake Oahe in

their religious ceremonies once the pipeline is operational, there is no specific ban on their

religious exercise, nor does performance of their sacraments trigger a sanction, loss of a

government benefit, or other collateral harm.  If a Jewish prisoner is denied kosher meals and

adheres to his belief that he cannot consume non-kosher food, he will starve. If a Muslim prisoner forbidden from growing a beard nonetheless grows one, he will be punished. But if the Tribe persists in its belief that DAPL will render the waters of Lake Oahe spiritually impure, it suffers no collateral consequence. In so stating, the Court does not diminish the significance of such a loss; indeed, inability to engage in religious conduct may cause deep personal and communal harm. The point is simply that the prisoner cases to which Cheyenne River draws a comparison involve an additional harm beyond the spiritual that is not present here.

### ii.   Recent Supreme Court Decisions

The Tribe next contends that Lyng and its Ninth Circuit progeny "are no longer good law" because of Hobby Lobby and Holt. See Mot. at 34; TRO Tr. 18:10-22. It offers two related arguments on this point. First, on the Tribe's reading of the cases, Navajo Nation held that the government's approval of the artificial snow could not constitute a substantial burden because its only effect was "on the Plaintiffs' subjective, emotional religious experience," Mot. at 35 (quoting Navajo Nation, 535 F.3d at 1070), but Hobby Lobby "rejected the premise that courts can determine the existence of a substantial burden under RFRA based upon whether it is reasonable in light of the government regulation." Id. Those holdings, however, are not in tension. The Ninth Circuit's conclusion that there was no substantial burden was not based on the notion that the plaintiffs' view that the artificial snow would desecrate the affected peaks was unreasonable; it was based on the lack of coercion in the face of a threatened sanction or a government benefit conditioned on religious adherence or forbearance. See 535 F.3d at 1063. The harm asserted by the affected tribes there lacked an essential element the appellate court deemed necessary to conclude that a substantial burden was present. Lyng, likewise, never concluded that the affected tribe's belief that constructing a road and harvesting timber in a

30

particular area would desecrate the site was unreasonable. It held that the government's actions did not constitute a substantial burden on the free exercise of such belief.

Hobby Lobby is not to the contrary. There, the Supreme Court concluded that the government mandate imposed a substantial burden because the owners of closely held corporations had to choose between providing insurance coverage to their employees for contraceptive methods that they believed to be abortifacients and incurring significant economic sanctions. See 134 S. Ct. at 2775-76. True, the Court accepted the owners' assertions that the covered contraceptive methods were "connected to the destruction of an embryo in a way that is sufficient to make it immoral for them to provide the coverage," id. at 2778, but the ultimate conclusion that the mandate imposed a substantial burden rested on the fact that the owners had to choose between violating their beliefs and paying financial penalties. The same was so in Holt. See 135 S. Ct. at 862 ("Because the grooming policy puts petitioner to this choice" between growing a beard and "serious disciplinary action," the policy "substantially burdens his religious exercise."). Again, the Tribe here faces no such coercion or sanction.

Second, Cheyenne River argues that this Court is not bound by Lyng because, as explained by the Supreme Court in Hobby Lobby and Holt, Congress did not intend to limit the analysis in RFRA cases to that undertaken in pre-Smith Free Exercise cases, of which Lyng was one. See Reply at 11-13. Hobby Lobby and Holt do provide that RFRA's religious-exercise protections are separate from and broader than the protections provided under First Amendment case law, but only in certain respects, none of which is helpful to the Tribe.

In Hobby Lobby, the Court discussed Congress's intent to "effect a complete separation from First Amendment case law" with regard to the definition of "exercise of religion." 134 S. Ct. at 2762; see also id. at 2772-73. After the Supreme Court held in City of Boerne v. Flores,

521 U.S. 507 (1997), that Congress lacked the power to apply RFRA to the States and its

subdivisions, the legislature passed RLUIPA, which "imposes the same general test as RFRA but

on a more limited category of governmental actions." Hobby Lobby, 134 S. Ct. at 2761. Prior to

RLUIPA's enactment, RFRA defined "exercise of religion" as "the exercise of religion under the

First Amendment." Id. (citing 42 U.S.C. § 2000bb-2(4) (1994 ed.)). In RLUIPA, "Congress

deleted the reference to the First Amendment and defined the 'exercise of religion' to include

'any exercise of religion, whether or not compelled by, or central to, a system of religious

belief.'" Id. at 2762 (quoting 42 U.S.C. § 2000cc-5(7)(A)). It then amended RFRA to include

the same definition. Id. at 2761 (citing 42 U.S.C. § 2000bb-2(4)).

The problem for Cheyenne River is that Hobby Lobby's rejection of the premise that

"RFRA did no more than codify th[e Supreme] Court's pre-Smith Free Exercise Clause

precedents" as they related to the concept of the "exercise of religion" makes no difference in

this case. Id. at 2772. No one disputes that the Corps' grant of the easement to Dakota Access

implicates the Tribe's religious exercise. The debate is instead about whether the action imposes

a substantial burden on that exercise. Hobby Lobby nowhere suggested that the Supreme

Court's reasoning or conclusion in Lyng that the parties there did not prove substantial burden is

no longer good law.

In Holt, the Supreme Court rejected the district court's conclusion that the Department of

Corrections' ban on beards did not substantially burden a Muslim inmate's religious exercise

because "he had been provided a prayer rug and a list of distributors of Islamic material, . . . was

allowed to correspond with a religious advisor, and was allowed to maintain the required diet and

observe religious holidays." 135 S. Ct. at 862. It explained that the district court had

"improperly imported a strand of reasoning from cases involving prisoners' First Amendment

rights," under which "the availability of alternative means of practice religion is a relevant consideration." Id. (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 351-52 (1987); Turner v. Safley, 482 U.S. 78, 90 (1987)). RLUIPA, Holt said, "provides greater protection." Id. Its "'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . , not whether the RLUIPA claimant is able to engage in other forms of religious exercise." Id.

Again, this break with certain pre-Smith cases simply does not matter here. Lyng's substantial-burden inquiry did not turn on whether the affected tribal members were able to engage in other forms of religious exercise. As previously noted, the Supreme Court would have reached the same result in Lyng — no substantial burden — had the construction of the road totally destroyed the affected tribe's ability to practice its religion. See Lyng, 485 U.S. at 451. Likewise, this Court's decision that Cheyenne River is unlikely to satisfy the substantial-burden inquiry is wholly unrelated to whether the Tribe's members are able to exercise their religion in other ways besides using water from Lake Oahe in Lakota ceremonies. Holt's caution that RLUIPA's substantial-burden inquiry is broader in one specific way than the inquiry undertaken in certain pre-Smith cases does not impliedly overrule Lyng or otherwise undermine its relevance here.

### iii. Tribe's Property Interest

Cheyenne River last argues that this case diverges from Lyng and its Ninth Circuit progeny because whereas those cases "concerned sacred sites located on lands owned solely by the federal government and in which . . . none of the plaintiffs could claim any cognizable property interest," here, "the Tribe and its members enjoy an actual legal ownership interest in the waters of Lake Oahe." Mot. at 33-34; see also TRO Tr. at 15:4-5, 16:24-25. The Court

cannot agree.  As the pipeline runs through the land under the lake, rather than the lake's waters, the Court first discusses ownership of the land and then turns to the Tribe's interest in the water.

In 1944, Congress passed the Flood Control Act, which "authorized the establishment of a comprehensive flood control plan along the Missouri River."  South Dakota v. Bourland, 508 U.S. 679, 683 (1993).  "Seven subsequent Acts of Congress authorized limited takings of Indian lands for hydroelectric and flood control dams on the Missouri River in both North and South Dakota."  Id.  One of these takings "involved the Oahe Dam and Reservoir Project, for which Congress required the Cheyenne River Sioux Tribe to relinquish 104,420 acres of its trust lands, including roughly 2,000 acres of land underlying the Missouri River."  Id.  In exchange, the Tribe received more than $10 million.  Id. at 683 n.2.  An additional $290 million in compensation was appropriated in 2000.  See Cheyenne River Sioux Tribe Equitable Compensation Act, P.L. No. 106-511, § 104(b)(1), 114 Stat. 2365 (2000).

The agreement between the Tribe and the United States to convey the land needed for the Oahe Dam, which created Lake Oahe, was memorialized in the Cheyenne River Oahe Act, Pub. L. No. 81-776, 68 Stat. 1191 (1954).  That Act states that payment for the lands at issue was "in settlement of all claims, rights, and demands of said Tribe or allottees or heirs thereof arising out of the construction of the Oahe project."  Id.  Section 10 addresses the Tribe's continued use of the land and provides that it "shall have the right, without cost, to graze stock on the land between the water level of the reservoir and the exterior boundary of the taking area" and that the Tribe and its members "shall have, without cost, the right of free access to the shoreline of the reservoir including the right to hunt and fish in and on the aforesaid shoreline and reservoir, subject, however, to regulations governing the corresponding use by other citizens of the United States."  68 Stat. at 1193.

The Supreme Court has since explained that, through the Flood Control and Cheyenne River Acts, Congress "clearly abrogated the Tribe's 'absolute and undisturbed use and occupation' of these tribal lands." Bourland, 508 U.S. at 697 (quoting 15 Stat. 636). "Thus, when the United States acquired reservation land to construct the [dam], the [Tribe] necessarily lost their treaty rights to exclusively own, occupy and utilize that land." Lower Brule Sioux Tribe v. State of South Dakota, 711 F.2d 809, 823 (8th Cir. 1983) (discussing whether the Fort Randall and Big Bend Acts — statutes similar to the Cheyenne River Act that authorized takings of Indian land for dams on the Missouri River — disestablished reservation boundaries or abrogated treaty rights to hunt and fish). Consequently, Cheyenne River cannot distinguish Lyng on the ground that, here, the Tribe has an ownership interest in the land under Lake Oahe. To the extent that Plaintiff has rights of access and use to the land, Lyng directly spoke to such a situation: "Whatever rights the Indians may have to the use of the area," the Court stated, "those rights do not divest the Government of its right to use what is, after all, its land." 485 U.S. at 453.

The water rights reserved to Indians pursuant to Winters v. United States, 207 U.S. 564 (1908), do not change the Court's conclusion. In Winters, water shortages near the Fort Belknap Reservation prompted a lawsuit to enforce tribal water rights against non-Indians who had been diverting water from the region. Id. at 565-67. The Supreme Court held that the United States had the power to reserve water and prevent its diversion from the reservation by private parties. Id. at 577. In so doing, it made clear that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose," such as the creation of a reservation for an Indian tribe, "the Government, by implication, reserves appurtenant water then

unappropriated to the extent needed to accomplish the purpose of the reservation." <u>Cappaert v.</u>
<u>United States</u>, 426 U.S. 128, 138 (1976).

Cheyenne River asserts that the purpose of its Reservation, as set out in the 1851 and
1868 Fort Laramie Treaties and the Act of March 2, 1889, is "to provide for self-sufficiency."
Mot. at 14.  The Tribe, however, does not persuasively support the proposition that this purpose
requires the federal government to refrain from permitting infrastructure projects on its own land
when doing otherwise would render water reserved for the reservation's use <u>spiritually</u> impure.
In an effort to so argue, the Tribe quotes the Supreme Court's observation in <u>Arizona v.</u>
<u>California</u>, 373 U.S. 546 (1963), that it was "impossible to believe" that when the federal
government created reservations, it was "unaware . . . that water from the river would be
essential to the life of the Indian people."  Reply at 8-9 (quoting <u>Arizona</u>, 373 U.S. at 599).  The
Tribe then contends that, "[i]n America, . . . there is no question that our laws . . . enshrine
religion and religious exercise as <u>essential to the life of the people</u>."  Reply at 9 (citing <u>Cantwell</u>
<u>v. Connecticut</u>, 310 U.S. 296, 303-04 (1940)).

The Court declines to embrace so broad a statement about the scope of <u>Winters</u>.  When
the Supreme Court spoke in <u>Arizona</u> of water sustaining life, it meant physical survival, not
spiritual satisfaction.  The Tribe's Reply quoted selectively from the case, but the full sentence
reads:

> It is impossible to believe that when Congress created the great
> Colorado River Indian Reservation and when the Executive
> Department of this Nation created the other reservations they were
> unaware that most of the lands were of the desert kind — hot,
> scorching sands — and that water from the river would be essential
> to the life of the Indian people and to the animals they hunted and
> the crops they raised.

373 U.S. at 598-99.  The opinion then goes on to discuss the importance of an adequate water supply for irrigation and agricultural production.  Id. at 599-600.  It does not mention religion, spirituality, ceremonies, or the like.

The other cases cited by the Tribe likewise hold only that the reserved water rights recognized in Winters extend to "the right to clean, safe water" and the "right to hunt, fish, and gather."  Mot. at 15 (citing Bourland, 508 U.S. at 697; United States v. Dion, 476 U.S. 734, 738 (1986); United States v. Winans, 198 U.S. 371, 381 (1905); United States v. Adair, 723 F.2d 1394, 1409, 1411 (9th Cir. 1983); United States v. Gila River Irrigation Dist., 920 F. Supp. 1444, 1448 (D. Ariz. 1996)).  Absent any colorable argument that the reserved water rights here extend to the right to access religiously pure water, the Court cannot conclude that Winters somehow permits the Tribe to circumvent Lyng.

In explaining its view on this issue, the Court notes that it is not deciding the Corps' obligations under the Fort Laramie Treaties regarding oil-spill prevention or the Tribes' rights to hunt, fish, or gather on Reservation lands.  Indeed, Cheyenne River has clearly stated that its "RFRA claim does not rely on the Corps' trust duties to the tribe."  Reply at 9.  Those trust issues are among the subjects raised in Standing Rock's and Cheyenne River's summary-judgment motions, see ECF Nos. 117, 131, and the Court anticipates addressing them in that context.

* * *

For these reasons, the Court holds that Lyng likely prevents the Tribe from showing that the Corps' decision to grant an easement to Dakota Access to operate an oil pipeline under Lake Oahe constitutes a substantial burden on its members' free exercise of religion.  The Tribe, accordingly, is unlikely to succeed on the merits of its RFRA claim.

37

**IV.    Conclusion**

For the foregoing reasons, the Court will deny the Motion for Preliminary Injunction.  A contemporaneous Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 7, 2017

38