**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE, *et al.*,

    Plaintiffs,

    and

CHEYENNE RIVER SIOUX TRIBE, *et al.*,

    Plaintiff-Intervenors,

    v.

U.S. ARMY CORPS OF ENGINEERS,

    Defendant,

    and

DAKOTA ACCESS, LLC,

    Defendant-Intervenor.

Civil Action No. 16-1534 (JEB)

<u>**MEMORANDUM OPINION**</u>

    Just like the Dakota Access Pipeline, which meanders over hill and dale before carrying its crude oil underneath Lake Oahe — a large reservoir on the Missouri River between North and South Dakota — the current litigation has wound its way through myriad twists and turns. Last year, in a hard-earned victory for the American Indian Tribe Plaintiffs whose reservations lie nearby, this Court found that Defendant U.S. Army Corps of Engineers had violated federal law by failing to produce an Environmental Impact Statement before granting Defendant-Intervenor Dakota Access, LLP an easement to run the pipeline under Lake Oahe. The Court subsequently vacated that easement and ordered the pipeline emptied of oil until the Corps could complete the federally mandated EIS.

Wasting no time, both Dakota Access and the Government promptly appealed to the D.C. Circuit.  In a partial win for the Tribes, the Court of Appeals affirmed the two central elements of this Court's rulings — specifically, that the Corps should have prepared an EIS and that the easement was properly vacated in the interim.  The Circuit thus confirmed that the pipeline was, in legal speak, an unlawful encroachment on federal land.

It was there, however, that the Tribes ran out of luck.  Prior to the cessation of any oil flow, the Circuit stayed and eventually reversed the aspect of this Court's order shutting down the pipeline, reasoning that it had not made the necessary findings for what was essentially injunctive relief.  In other words, although vacatur of the easement rendered the pipeline an encroachment on federal property, vacatur could not itself bring about the stoppage of oil.  For that to occur, the Court of Appeals clarified, this Court needed to conduct an additional, distinct inquiry, a component of which requires the Tribes to demonstrate that — among other things — they will likely suffer irreparable harm in the absence of an order closing the pipeline.

As a result, for all of the headlines and controversy that this litigation has spawned, its tangible consequences for the pipeline itself have been few.  Even though this Court vacated the easement for DAPL to cross beneath Lake Oahe, and even though the D.C. Circuit affirmed such vacatur, the pipeline has maintained operations as if none of these developments had occurred. Those seeking an explanation for the persistence of this surprising state of affairs over the past ten-odd months need look no further than the Defendant in this case: the Corps.

Ever since this Court's vacatur order in July 2020, and across two presidential administrations, the Corps has conspicuously declined to adopt a conclusive position regarding the pipeline's continued operation, despite repeated prodding from this Court and the Court of Appeals to do so.  On the one hand, the agency has refrained from exercising its enforcement

powers to halt Dakota Access's use of the pipeline, notwithstanding its status as an unlawful encroachment.  At the same time, however, neither has the Corps affirmatively authorized the pipeline's occupation of the area underneath Lake Oahe per the process contemplated in its internal procedures.  Its chosen course has instead been — and continues to be — one of inaction.  Such indecision, it is important to note, does not stem from a lack of time.  Nor from a lack of attention.  Whatever the reason, the practical consequences of the Corps' stasis on this question of heightened political controversy are manifest: the continued flow of oil through a pipeline that lacks the necessary federal authorization to cross a key waterway of agricultural, industrial, and religious importance to several Indian Tribes.

Those Tribes thus find themselves forced to return to this Court to seek what they have so far been unable to obtain from the Government: an order halting pipeline operations until the Corps completes its new EIS.  Before the Court may grant them such relief, however, binding caselaw requires that the Tribes make an evidentiary showing far beyond anything the Corps needs to itself shut down DAPL.  As previously mentioned, they must demonstrate a likelihood of irreparable injury from the action they seek to enjoin — to wit, the pipeline's operation.  For the reasons articulated in this Opinion, Plaintiffs have not cleared that daunting hurdle.

The Court acknowledges the Tribes' plight, as well as their understandable frustration with a political process in which they all too often seem to come up just short.  If they are to win their desired relief, however, it must come from that process, as judges may travel only as far as the law takes them and no further.  Here, the law is clear, and it instructs that the Court deny Plaintiffs' request for an injunction.

# I.    Background

The Court has recounted the factual and procedural history underlying this litigation on numerous occasions since it commenced in the summer of 2016.  Eleven Opinions later, the Court need relate only information necessary to set the stage for the present Motion; it refers readers hungry for more to its prior writings.  See, e.g., Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock III), 255 F. Supp. 3d 101, 114–16 (D.D.C. 2017); Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock VII), 471 F. Supp. 3d 71, 77–78 (D.D.C. 2020).

## A.    Pre-Vacatur

This case began as an effort by several Tribes to halt the construction — and eventually the operation — of DAPL.  The pipeline carries crude oil from North Dakota to Illinois along a 1,200-mile path, a small segment of which runs deep beneath Lake Oahe.  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock VI), 440 F. Supp. 3d 1, 9 (D.D.C. 2020). An artificial reservoir created in 1958 following a congressional taking of land from the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe, the "lake" supplies the Tribes with drinking water and supports myriad other critical functions.  Id. at 9–10.

Given that no permit is generally required for oil pipelines traversing private land, the legal dispute here has largely fixated on that relatively small segment buried under Lake Oahe. After an initial pair of failed bids to enjoin the pipeline's construction and operation under two federal statutes irrelevant to the present Motion, the Tribes finally pinned their hopes on the National Environmental Policy Act.  Id. at 10–11.  Under NEPA, agencies must "consider every significant aspect of the environmental impact of a proposed action," Balt. Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97 (1983) (quoting Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S.

519, 553 (1978)), so as to "inform the public that it has indeed considered environmental concerns in its decisionmaking process." Id. (citing Weinberger v. Catholic Action of Haw., 454 U.S. 139, 143 (1981)). Agencies must draft an Environmental Assessment, see 40 C.F.R. § 1501.4(b), that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement [EIS] or a finding of no significant impact [FONSI]." Id. § 1508.9(a). "If any 'significant environmental impacts might result from the proposed agency action[,] then an EIS must be prepared before agency action is taken." Grand Canyon Trust v. FAA, 290 F.3d 339, 340 (D.C. Cir. 2002) (quoting Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983)); see also 42 U.S.C. § 4332(2)(C). In order to determine whether an action may have "significant" environmental impacts, an agency must consider — among other criteria — "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4).

In its EA, the Corps concluded that no EIS was necessary before issuing Dakota Access a couple of necessary authorizations — a permit for DAPL's placement at Lake Oahe under the Rivers and Harbors Act, 33 U.S.C. § 408, and an easement to cross beneath the lake under the Mineral Leasing Act, 30 U.S.C. § 185 — on July 25, 2016, and February 8, 2017, respectively. Standing Rock VI, 440 F. Supp. 3d at 10; Standing Rock III, 255 F. Supp. 3d at 114, 116; ECF No. 183-9 (Section 408 Decision Package) at ECF pp. 3–4, 6–7; ECF No. 172-11 (Easement). The Tribes argued that the Corps' failure to require an EIS before granting those approvals violated NEPA. Standing Rock VI, 440 F. Supp. 3d at 11. Following a 2017 decision in which this Court remanded the matter to the agency for additional evaluation, see Standing Rock III, 255 F. Supp. 3d at 112, the Court in March 2020 finally agreed that the Corps should have prepared an EIS before conferring the easement. Standing Rock VI, 440 F. Supp. 3d at 8, 17

(finding "unresolved scientific controversy" that confirmed "necessity of an EIS"). It thus granted summary judgment to Plaintiffs and remanded for the agency to complete one. Id. at 26.

Such NEPA violation established, the question then became what to do about the easement during the time necessary to prepare an EIS. This Court provided the answer on July 6, 2020, when it vacated such easement and ordered that the pipeline be emptied of oil during the remand process. Standing Rock VII, 471 F. Supp. 3d at 88; see also id. at 79 (noting that vacatur is "the 'standard remedy' in this Circuit for an 'action promulgated in violation of NEPA'") (quoting Humane Soc'y of U.S. v. Johanns, 520 F. Supp. 2d 8, 37 (D.D.C. 2007)). Although it acknowledged that "at least some immediate harm to the North Dakota oil industry should be expected from a DAPL shutdown," the Court determined that the "seriousness of the Corps' NEPA error, the impossibility of a simple fix, the fact that Dakota Access did assume much of its economic risk knowingly, and the potential harm each day the pipeline operates" collectively outweighed such negative economic effects. Id. at 84, 88. The legal effect of vacating the easement was to render the pipeline an "encroachment" on federal land. Id. at 87; see also ECF No. 562-4 (8/17/20 Ltr. from Corps to Dakota Access) at ECF p. 2 (explaining that, following Court's remedy order, "the portion of the pipeline subject to the vacated easement is no longer considered by the Corps as an active easement, and its status has been changed to an encroachment on the Corps-managed federal land at Lake Oahe"). As for vacatur's practical effect, the Court "require[d] the oil to stop flowing and the pipeline to be emptied within 30 days." Standing Rock VII, 471 F. Supp. 3d at 88.

B. Post-Vacatur

Displeased with that outcome, Dakota Access and the Corps promptly noticed their appeals. See ECF Nos. 548, 557. Their recourse to the court upstairs soon bore fruit — at least

in part.  On August 5, 2020, a D.C. Circuit motions panel denied Defendants' bid to stay this Court's decisions that the Corps erred in not preparing an EIS and that the MLA easement should be vacated pending the statement's completion.  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock VIII), 2020 WL 4548123, at *1 (D.C. Cir. Aug. 5, 2020).  The panel, however, placed on hold the aspect of this Court's order shutting down the pipeline and emptying it of oil, reasoning that the Court "did not make the findings necessary for" such injunctive relief in NEPA cases.  Id. (citing Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 158 (2010)).  The Circuit also noted, "We expect [Government] appellants to clarify their positions before the district court as to whether the Corps intends to allow the continued operation of the pipeline notwithstanding vacatur of the easement and for the district court to consider additional relief if necessary."  Id.

Such "clari[t]y," id., did not obtain.  As merits briefing continued in the Court of Appeals, the parties returned to this Court where the Corps, in light of the Circuit's having stayed the stoppage of oil flow, took its first stab at "detailing the options it is considering on vacatur." 8/10/20 Min. Order.  Acknowledging that the pipeline now constituted an encroachment, the agency explained that its "general policy is to require removal of encroachments and restoration of the premises."  ECF No. 562 (8/31/20 Status Rep.) at 3 (internal quotation marks and citation omitted).  That outcome was not inevitable, though, as another option available to the Corps — called an "outgrant" — would authorize Dakota Access to use the government-controlled property as it did prior to vacatur, thus effectively issuing it another easement.  Id. at 4–5.  As the agency admitted, however, that process was subject to the strictures of NEPA, the very statute under which this Court had ordered the preparation of an EIS before any such easement could be granted.  Id. at 5–6; Standing Rock VI, 440 F. Supp. 3d at 8.

The Corps additionally maintained — without citing any authority — that it was under no obligation "to take any particular action to cure an encroachment within a specified time period" or even "to ultimately cure the encroachment at all." 8/31/20 Status Rep. at 4. It estimated that it would make an "initial decision" as to a potential enforcement action against the pipeline by early October 2020, though it emphasized that it retained the "enforcement discretion to adapt its enforcement recommendations based on new information" at any time. Id. at 9. In the meantime, the agency would engage in multi-level "coordination . . . to ascertain whether the Pipeline's unauthorized use presents risk to the Corps' project and to find the best way . . . to resolve the situation of unauthorized use of the property interest." Id. at 6; see also ECF No. 564 (9/8/20 Joint Status Rep.) at 2 (Corps reiterating that it "is proceeding with its encroachment review process"). It also expressed its desire to discuss "potential additional safety measures" with both Dakota Access and the Tribes. See 8/31/20 Status Rep. at 7–9.

Having thus received minimal concrete assistance from the Corps, the Court acceded to the Tribes' request for a briefing schedule on the propriety of an injunction to halt the flow of oil (as contemplated by the D.C. Circuit's August stay order). See ECF No. 567 (9/11/20 Order) at 1–2; 9/17/20 Min. Order (setting briefing schedule). The Court noted its expectation that such briefing would focus on the issue of irreparable harm, one of the four requirements for permanent injunctive relief. See 9/11/20 Order at 2. The Tribes soon filed the present Motion, see ECF No. 569 (Pl. Mot.), which the Corps and Dakota Access opposed. See ECF Nos. 573 (Corps Opp.), 577 (DA Opp.). October, meanwhile, came and went without any word from the Corps regarding its promised "initial decision" as to a potential enforcement action. See 8/31/20 Status Rep. at 9.

On January 26, 2021 — shortly after the district-court briefing on Plaintiffs' injunctive-relief request became ripe, see ECF No. 586 (Pl. Reply) — the D.C. Circuit issued its merits-panel opinion in the pending appeal of this Court's summary-judgment and vacatur orders. In a detailed and comprehensive ruling, that court followed the roadmap previewed by the motions panel and affirmed this Court's top-line conclusions that: 1) the Corps' decision not to prepare an EIS violated NEPA, and 2) the easement should be vacated pending such statement's completion. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock IX), 985 F.3d 1032, 1039 (D.C. Cir. 2021). The Circuit subsequently denied Dakota Access's request for en banc review of these holdings on April 23, 2021, and the court's mandate issued shortly thereafter. See Order, No. 20-5197 (D.C. Cir. Apr. 23, 2021); Mandate (D.C. Cir. May 19, 2021).

The Circuit also reversed this Court's order shutting down the pipeline. Standing Rock IX, 985 F.3d at 1053–54. This time, the Court of Appeals elaborated on why vacatur of the easement was not itself sufficient to bring about a stoppage of oil flow. Unlike a challenge to an agency-issued construction or operating permit, vacatur of which would "naturally impl[y] an end" to such construction or operation, the present litigation involves an easement merely "authorizing the pipeline to cross federal lands." Id. at 1054. "With or without oil flowing," accordingly, "the pipeline will remain an encroachment, leaving the precise consequences of vacatur uncertain." Id. That posture, the Circuit emphasized, rendered this case "quite unusual"; it could not identify a single other instance "in which the sole issue before a court was whether an easement already in use (rather than a construction or operating permit) must be vacated on NEPA grounds." Id. At any rate, the panel made clear that this Court "could not order the

pipeline to be shut down without . . . making the findings necessary for injunctive relief" under the traditional four-factor test. Id. (citing Monsanto, 561 U.S. at 158).

The Circuit closed in the same fashion as its August 2020 stay order: with an overt prod of the Corps. While noting that "how and on what terms the Corps will enforce its property rights is, absent a properly issued injunction, a matter for the Corps to consider in the first instance," the Court of Appeals emphasized that it "would expect [the agency] to decide promptly. To do otherwise would be to issue a *de facto* outgrant without engaging in the NEPA analysis that the Corps concedes such an action requires." Id.

With the Circuit's opinion and attendant guidance in hand, this Court promptly scheduled a status hearing for the purpose of discussing its impact on Plaintiffs' bid for injunctive relief, as well as "how the Corps expects to proceed given the vacating of the easement." 1/27/21 Min. Order. Two days before that hearing, the Corps — fresh off a change of administration in January 2021 — sought a two-month continuance for the purpose of "brief[ing] new officials regarding this case." ECF No. 587 at 1. No party opposed the request, which the Court granted. Id. at 2; 2/9/21 Min. Order.

When the long-awaited hearing finally arrived on April 9, 2021, however, the Corps — despite the instruction from both the Court of Appeals and this Court, as well as its own continuance request — had surprisingly little to say about the pipeline's encroachment status. Indeed, far from issuing the contemplated "prompt[]" determination as to how it would "enforce its property rights," Standing Rock IX, 985 F.3d at 1054, the Corps' decision appeared to be that it would make no decision at all. According to Government counsel, "[T]he Corps is in a [*sic*] essentially continuous process of evaluating the status of the encroachment and what steps are best to take." ECF No. 602 (4/9/21 Tr.) at 10:23–25. While the agency would "continue[]

monitor[ing]" the pipeline and could "take an enforcement action at any time," it had "no . . .

enforcement action to announce" at present nor any "timeline" for such potential action moving

forward.  Id. at 8:5–6, 8:12–14, 9:3–5, 11:7–8.  At one point, the Corps seemed to acknowledge

the possibility that it might not even decide how to enforce its property rights prior to completion

of the judicially mandated EIS (currently estimated for March 2022).  Id. at 8:19–20; ECF No.

601 (5/3/21 Status Rep.) at 1.  In light of that report, both Plaintiffs and the Government agreed

that the proper course was for the Court to resolve the fully briefed injunction motion.  See

4/9/21 Tr. at 13:10–12, 15:9–14.

Following receipt of short supplemental filings from both Dakota Access and the Tribes,

see ECF Nos. 593 (Dakota Access Surreply), 597 (Pl. Surreply Resp.), the Court ordered the

Corps to clarify its position on whether an injunction should issue.  See 4/26/21 Min. Order.  The

agency's response was less than decisive.  While the Corps appeared to tepidly reiterate its prior

opposition to the Tribes' injunctive-relief bid, its submission also contained some hedging:

> As to whether an injunction should issue, the EIS process in which
> the Corps is currently engaged examines many factors including
> some that may be relevant to the permanent injunction standard.  It
> is possible that in the EIS process the Corps would find new
> information, but to date the Corps is not aware of information that
> would cause it to evaluate the injunction factors differently than in
> its previous filing.

5/3/21 Status Rep. at 2 (citing Corps Opp.).  With this long procedural history in tow, the Court

is finally prepared to rule on the Tribes' request for an injunction.

## II.    Analysis

The Court begins with an overview of the permanent-injunction factors, devoting

particular attention to the requirement that a plaintiff suffer irreparable injury.  It then applies

that requirement to the circumstances of this case.  Because the Court concludes that Plaintiffs

have not established irreparable harm, it has no need to address the other factors or Defendants'
additional arguments for why injunctive relief is improper.

Before diving in, the Court briefly disposes of a threshold argument made by the Tribes
— specifically, that it should "clarify that pipeline operations must be suspended pursuant to its
vacatur order even <u>without</u> an injunction." Pl. Mot. at 3 (emphasis added). This misses the
mark. The D.C. Circuit held precisely to the contrary in its January 2021 opinion reversing this
Court's shutdown order. <u>See</u> <u>Standing Rock IX</u>, 985 F.3d at 1054 ("[W]e nonetheless conclude
that [the district court] could not order the pipeline to be shut down without, as required by
<u>Monsanto</u>, making the findings necessary for injunctive relief."); <u>id.</u> at 1053–54 (explaining why
vacatur of easement was itself insufficient to stop oil flow). That ruling postdated Plaintiffs'
briefing on the present Motion. Because it is now clear that the Tribes' shutdown request "seeks
more than mere vacatur," the Court must find the permanent-injunction criteria fulfilled before
issuing such relief. <u>Ctr. for Biological Diversity v. Ross</u>, 480 F. Supp. 3d 236, 250 (D.D.C.
2020).

A. <u>Irreparable Harm</u>

A permanent injunction "is a drastic and extraordinary remedy." <u>Monsanto</u>, 561 U.S. at
165. It "should not be granted as a matter of course," <u>id.</u>, and it "does not follow from success
on the merits." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 32 (2008). Rather, it "should
issue only if the traditional four-factor test is satisfied." <u>Monsanto</u>, 561 U.S. at 157. In order to
pass that test, a plaintiff must convince the Court:

> (1) that it has suffered an irreparable injury; (2) that remedies
> available at law, such as monetary damages, are inadequate to
> compensate for that injury; (3) that, considering the balance of
> hardships between the plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not be disserved by
> a permanent injunction.

Id. at 156–57 (quoting eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006)) (applying

four factors when plaintiff sought permanent injunction to remedy NEPA violation).  While the

irreparable-harm requirement is recited in the past tense, it is clear that future harm may qualify.

Id. at 162 (determining that respondents did not adequately show "that they will suffer

irreparable injury" if agency were "allowed to proceed").

The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal

courts has always been irreparable injury and the inadequacy of legal remedies."  Weinberger v.

Romero-Barcelo, 456 U.S. 305, 312 (1982); see also Chaplaincy of Full Gospel Churches v.

England, 454 F.3d 290, 297 (D.C. Cir. 2006) (same).  "A movant's failure to show any

irreparable harm is therefore grounds for refusing to issue" injunctive relief.  Chaplaincy of Full

Gospel Churches, 454 F.3d at 297; see also CityFed Fin. Corp. v. Off. of Thrift Supervision, 58

F.3d 738, 747 (D.C. Cir. 1995) ("Because [plaintiff] has made no showing of irreparable injury

here, that alone is sufficient for us to conclude that the district court did not abuse its discretion

by rejecting [plaintiff's] request."); Sierra Club v. U.S. Army Corps of Eng'rs, 990 F. Supp. 2d 9,

38 (D.D.C. 2013) ("Plaintiffs must demonstrate that they will suffer irreparable harm absent an

injunction in order to be eligible for injunctive relief.").  "Indeed, if a court concludes that a

movant has not demonstrated irreparable harm, it need not even consider the remaining factors."

Dallas Safari Club v. Bernhardt, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (citing CityFed Fin.

Corp., 58 F.3d at 747); see also Colo. Wild Horse v. Jewell, 130 F. Supp. 3d 205, 218 (D.D.C.

2015).

The D.C. Circuit "has set a high standard for irreparable injury."  Chaplaincy of Full

Gospel Churches, 454 F.3d at 297.  "[T]he injury must be both certain and great; it must be

actual and not theoretical."  Id. (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir.

1985)).  Of critical importance is a demonstration that the "injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (quoting Wis. Gas., 758 F.2d at 674) (cleaned up); see also Wis. Gas, 758 F.2d at 674 ("Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time . . . .") (citation and internal quotation marks omitted).  Notwithstanding some Circuit language using a "certainty" standard, all agree here that a plaintiff seeking permanent injunctive relief must at least "demonstrate that irreparable injury is likely in the absence of an injunction."  Winter, 555 U.S. at 22; see Pl. Reply at 13; DA Opp. at 9–10; Corps Opp. at 5–6; see also Winter, 555 U.S. at 32–33 (noting that analysis of preliminary-injunction requirements applies to permanent injunctions); Monsanto, 561 U.S. at 162; Ctr. for Biological Diversity, 480 F. Supp. 3d at 251 (acknowledging lack of clarity regarding whether future irreparable harm must be "certain" or merely "likely" to occur).  A mere "possibility" of future harm is insufficient.  Winter, 555 U.S. at 21–22; see also 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. and Proc. § 2942 (3d ed.) ("There must be more than a mere possibility or fear that the injury will occur.").

A plaintiff attempting to establish irreparable harm thus faces a "considerable burden," Save Jobs USA v. U.S. Dep't of Homeland Sec., 105 F. Supp. 3d 108, 112 (D.D.C. 2015) (citation omitted), and a "very high bar."  Coal. for Common Sense in Gov't Procurement v. United States, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  In order to clear it, the movant must "substantiate [its] claim that irreparable injury is 'likely' to occur."  Wis. Gas, 758 F.2d at 674. "Bare allegations" to that effect "are of no value"; a court, rather, requires affirmative "proof" of likelihood and imminence.  Id.  Additionally, "the movant must show that the alleged harm will directly result from the action which [it] seeks to enjoin."  Id.

B.  <u>Application</u>

The Tribes posit three different kinds of injuries, each of which they claim independently qualifies as imminent irreparable harm and entitles them to permanent injunctive relief.  The Court will spend most of its time on the first of these before disposing of the last two with greater dispatch.

1.  *Threat of Damaging Oil Spill*

Plaintiffs' principal claim of irreparable injury derives from the threat of an oil spill underneath Lake Oahe.  <u>See</u> Pl. Mot. at 9–14; Pl. Reply at 13–16.  That reservoir, as previously mentioned, provides the Tribes with water for drinking, industry, and sacred practices.  In order for them to realize any harm from a pipeline leak, however, a series of contingent events must occur: 1) a spill under Lake Oahe; 2) of sufficiently large size; 3) the oil from which rises 92 feet from the pipeline to the bottom of the lake; and 4) which cannot be sufficiently mitigated or contained either before or upon entering the lake.  <u>See</u> DA Opp. at 11.  Simply itemizing that causal chain suggests the fundamental problem with Plaintiffs' irreparable-harm argument: they have not established, as they must, that any of the chain's individual components — let alone the feared end result — is "<u>likely</u>," as opposed to merely "possibl[e]."  <u>Winter</u>, 555 U.S. at 22.  Without such showing, of course, they cannot demonstrate the probability of a damaging DAPL spill at Lake Oahe sufficient to warrant injunctive relief.

Start with the threat of a spill itself.  Throughout this long-running litigation, the Court has repeatedly determined that such risk is low.  <u>See</u> <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock IV</u>), 282 F. Supp. 3d 91, 101, 105 (D.D.C. 2017) (referencing "low" likelihood and "minimal risk" of oil spill under Lake Oahe); <u>Standing Rock VI</u>, 440 F. Supp. 3d at 29 (similar); <u>Standing Rock VII</u>, 471 F. Supp. 3d at 85 (similar).  Indeed, in 2017,

this Court rebuffed Standing Rock's challenge to the Corps' assessment that the risk of a spill under Lake Oahe is "very low," "unlikely," or "negligible," finding that the agency had taken a "hard look" at the issue and sufficiently "support[ed] its conclusion that such a risk was low." Standing Rock III, 255 F. Supp. 3d at 125–27, 149; see also ECF No. 172-1 (Final EA) at 48, 87, 92 ("[T]he risk of an inadvertent release in, or reaching, Lake Oahe . . . is extremely low."). Even Plaintiffs seem to acknowledge that a spill at Lake Oahe is of "lower probability." Pl. Mot. at 11.

The Court need not rehash all the evidence giving rise to those prior determinations. See, e.g., Standing Rock III, 255 F. Supp. 3d at 125–27; DA Opp. at 14–15. It bears noting, though, that reportable-incident data from the Pipeline and Hazardous Materials Safety Administration (PHMSA) reflect but a single, 1.7-barrel leak between 2010 and 2020 on any crude-oil pipeline installed using horizontal directional drilling technology, the very method in place at DAPL's Lake Oahe crossing. See ECF No. 593-4 (Supplemental Declaration of John F. Godfrey), ¶ 16. Dakota Access deployed HDD in order to bury the pipeline far beneath the bottom of Lake Oahe, thus mitigating — among other things — the risk of damage from outside forces. See ECF No. 543-2 (Second Declaration of John F. Godfrey), ¶ 40; ECF No. 520-1 (Declaration of Michael C. Aubele), ¶ 8. In addition, Dakota Access reports that no spills have occurred at Lake Oahe or anywhere else along DAPL's nearly 1,200-mile mainline since the pipeline commenced operations nearly four years ago. See Godfrey Suppl. Decl., ¶ 3e; ECF No. 585-6 (Fifth Declaration of Todd Stamm), ¶ 4. The Tribes do not dispute that record, instead pointing to several spills on a different pipeline operated by Energy Transfer (DAPL's owner), along with a few minor incidents at Dakota Access facilities (as opposed to the mainline), the spilled oil from which was all remediated. See Pl. Mot. at 14 (citing ECF No. 527-5 (Third Declaration of

Donald Holmstrom), ¶¶ 14, 18); Godfrey 2d Decl., ¶ 6; DA Opp. at 14.  An early declaration

from one of Plaintiffs' own experts, moreover, indicates that a DAPL mainline spill is even <u>less</u>

probable today than during its (incident-free) start-up phase, as "pipelines are mostly likely to

leak or fail when they are brand new."  ECF No. 272-2 (Third Declaration of Richard B.

Kuprewicz), ¶¶ 9–10; <u>see also</u> Godfrey 2d Decl., ¶ 20.  These historical data, when combined

with the numerous safety measures in place at Lake Oahe, <u>see</u> ECF No. 562-5 (8/20/20 Ltr. from

Dakota Access Counsel to Plaintiffs' Counsel) at 2 (listing some), suggest that the chance of a

spill at the crossing is especially unlikely.

     The Tribes face similar challenges when it comes to the remaining links in the

aforementioned causal chain.  With respect to the size of any pipeline leak under Lake Oahe —

should one occur — their present briefing never rebuts Dakota Access's evidence that, in light of

historical spill data and DAPL's leak-detection and shutdown systems, the probability of any

large spill is relatively low.  <u>See</u> DA Opp. at 15–16.  Nor do they acknowledge additional safety

features recently added at Lake Oahe, including backup power for remotely actuating local

shutoff valves in the event of a primary-power failure.  <u>See</u> Stamm 5th Decl., ¶ 7.  While

Plaintiffs gesture at Dakota Access's "plans" to increase the pipeline's throughput, <u>see</u> Pl. Mot.

at 18, they have not explained precisely how any such occurrence would measurably augment

the likelihood of a large spill, nor offered any information suggesting that a significant increase

in oil flow is imminent.

     Even if a large leak did occur underneath the lake, moreover, the oil would have to rise

more than 90 feet — roughly the length of an NBA basketball court — through a collection of

low-permeability deposits, sediments, and clay before reaching the lakebed.  <u>See</u> Aubele Decl.,

¶ 15.  That is no easy journey.  Indeed, according to the Corps' remand analysis, the deep,

underground HDD installation "virtually eliminates the ability of a spill to interact with the surface water."  ECF No. 407-1 (Remand Analysis Record) at 58 (alteration omitted); see also Aubele Decl., ¶ 15 (similar); ECF No. 520-3 (Declaration of Todd Stamm), ¶ 41.  Plaintiffs, once again, never acknowledge these physical barriers.  Finally, the Tribes do not here account for Dakota Access's PHMSA-approved response plans, which are aimed at promptly mitigating and remediating any large hypothetical spill that might reach the lake.  See Stamm Decl., ¶¶ 19–23; Aubele Decl., ¶ 22; cf. Manzanita Band of Kumeyaay Nation v. Wolf, 496 F. Supp. 3d 257, 264–65 (D.D.C. 2020) (finding plaintiff's irreparable-harm argument "undermined by . . . measures in place" to "mitigate" any such harm, including surveys, re-surveys, consultation, and additional protocol).

       Whether framed in terms of likelihood or imminence, Plaintiffs have not made a successful showing of irreparable harm based on the threat of an oil spill at Lake Oahe.  Not only do they fail to engage with Dakota Access's evidence that a large, damaging, irremediable spill is unlikely, they never actually point to evidence suggesting that such an incident is likely.  That will not do.  The "burden is on the Tribe[s] to indicate why" the flow of oil "must be enjoined to prevent an injury likely to occur to [them]."  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock I), 205 F. Supp. 3d 4, 36 (D.D.C. 2016); see also Wis. Gas, 758 F.2d at 674 (explaining that movant must "substantiate the claim that irreparable harm is 'likely' to occur" with affirmative "proof," not just "[b]are allegations of what is likely to occur").  Without such substantiation, each successive link in Plaintiffs' chain of events — along with the ultimate outcome they fear — appears far too "hypothetical" to support an award of injunctive relief.  Wis. Gas, 758 F.2d at 675; see also Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 976 (D.C. Cir. 1985) (deeming likelihood of irreparable harm "too small" where plaintiffs "only

vaguely sketch[ed] the contours of th[e] asserted harm"); Bill Barrett Corp. v. U.S. Dep't of Interior, 601 F. Supp. 2d 331, 335–36 (D.D.C. 2009) (no irreparable harm where "the weight of the evidence is, at best, inconclusive as to whether" injury "is likely to occur").

It so happens that another court in this district has encountered a similar argument from plaintiffs in comparable circumstances — to wit, that operation of a particular pipeline "risks a devastating oil spill that would be damaging to nearby communities" and that such "harm is sufficient to warrant an injunction."  Sierra Club, 990 F. Supp. 2d at 41.  There, as here, the movants insisted that a potential spill "poses an unacceptable risk" to water supplies.  Id. at 41 n.18; see, e.g., Pl. Mot. at 11 (quoting ECF No. 527-8 (Declaration of Patrick S. Flanders), ¶¶ 9, 20 (same exact language)).  Judge Ketanji Brown Jackson, however, found such assertions insufficient to establish irreparable harm because the plaintiffs "have not shown that a damaging oil spill is likely to occur."  Sierra Club, 990 F. Supp. 2d at 41.  In other words, because "the harms that an oil spill might potentially someday cause . . . are not certain," they could not "satisfy the 'irreparable harm' standard."  Id.; see also Sierra Club v. U.S. Army Corps of Eng'rs, 482 F. Supp. 3d 543, 559 (W.D. Tex. 2020) (rejecting irreparable-harm argument based on "a series of assumptions" that "tends toward speculation" — namely, "that a similar drilling accident is likely to happen again at a water crossing, that drilling fluid will be released, that drilling fluid will cause harm, and that the harm will be irreparable"); City of Austin v. Kinder Morgan Tex. Pipeline, LLC, 447 F. Supp. 3d 558, 570–71 (W.D. Tex. 2020) (rejecting irreparable-harm argument where "the conditions required for that harm to occur are neither imminent nor reasonably certain" and where plaintiffs' posited "causal chain becomes increasingly attenuated by surmise and speculation").  The same is true in this case.

Rather than actively disputing the low likelihood of a damaging spill and offering evidence to the contrary, the Tribes' briefing gestures back to this Court's summary-judgment ruling, which determined that expert commenters had identified "serious gaps in crucial parts of the Corps' analysis" regarding the effectiveness of the pipeline's leak-detection system, its operator's less-than-sterling safety record, and the agency's worst-case-discharge calculation. See Pl. Mot. at 10 (quoting Standing Rock VI, 440 F. Supp. 3d at 26).  That tack, however, confuses the evidentiary showing required at summary judgment with the distinct and lofty burden they encounter here.  While the existence of "unresolved scientific controversy" and "unanswered" questions in the Corps' published materials could win the Tribes a remand for preparation of an EIS under NEPA on the ground that such issues made the easement approval "highly controversial," Standing Rock VI, 440 F. Supp. 3d at 8, 17, it does little to establish a likelihood that the Tribes will suffer imminent, irremediable harm at Lake Oahe from the pipeline's continued operation.  Put differently, Plaintiffs cannot simply fall back on their evidentiary proffer at summary judgment and this Court's concomitant conclusions, as that stage involved a different legal inquiry than does the present.

So, too, with their invocation of last year's vacatur proceedings.  For instance, the Tribes contend that the Court "has already considered all th[e] evidence" of low spill risk cited by Dakota Access "and nonetheless found that shutting down the pipeline was warranted under a vacatur standard."  Pl. Reply at 15.  This Court's vacatur Opinion, however, did not have cause to explore the likelihood of a damaging pipeline spill in any capacity; it instead turned on "the serious deficiencies in the Corps' decision not to prepare an EIS" and "the disruptive consequences" that might follow a shutdown order.  See Standing Rock VII, 471 F. Supp. 3d at 82 (citing Allied-Signal v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150–51 (D.C. Cir.

1993)).  Notwithstanding that ruling, the Court of Appeals has since made clear that this Court may only order an oil stoppage upon finding that (among other things) the Tribes will likely experience irreparable harm absent such relief.  The prior vacatur holding has little relevance to that question.

Nor can Plaintiffs argue that, regardless of the "precise extent" of the risk of a spill, they "have made the requisite showing that DAPL has cut corners on safety, thereby exacerbating the risks of a dangerous enterprise, which supports injunctive relief."  Pl. Reply at 15.  The mere fact that an injunction would cause a "reduction in <u>risk</u>" is insufficient "to establish that irreparable harm is likely in the absence of an injunction."  <u>Ctr. for Biological Diversity</u>, 480 F. Supp. 3d at 251.  It is precisely that latter showing that they have not made out.  Similarly, they cannot point to the Corps' NEPA violation as somehow discharging or lowering the "very high bar" they must clear in proving a likelihood of irreparable injury.  <u>Coal. for Common Sense</u>, 576 F. Supp. 2d at 168; <u>see</u> <u>Brady Campaign to Prevent Gun Violence v. Salazar</u>, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) ("[A] procedural violation of NEPA is not itself sufficient to establish irreparable injury . . . .").  To the extent that the agency's incomplete environmental evaluation deprived the Tribes of certain information that might aid their case, <u>see</u> Pl. Mot. at 13, "[b]y definition," such "uncertainty falls short of the type of actual and imminent threat needed to show irreparable injury."  <u>Cal. Ass'n of Pvt. Postsecondary Schs. v. DeVos</u>, 344 F. Supp. 3d 158, 172 (D.D.C. 2018) (citing <u>Wis. Gas</u>, 758 F.2d at 674).  The absence of information regarding potential environmental harm is a far cry from affirmative evidence of irreparable injury.  Contrary to the Tribes' formulation, the question is not whether "the <u>Corps</u> . . . can[] assure that [an irremediable spill] will not occur," Pl. Mot. at 14 (emphasis added), but rather whether <u>they</u> can establish a likelihood of such harm.  Indeed, no lesser authority than the Supreme Court has expressly

rejected the argument that there is a "thumb on the scales" favoring injunctive relief — or a

shifting of the burden of proof therefor — when an agency runs afoul of NEPA.  Monsanto, 561

U.S. at 157.

At times, the Tribes adopt a different approach.  Seemingly acknowledging that damage

from a large oil spill at Lake Oahe is of "lower probability," they maintain that an injunction is

nonetheless warranted because any such spill would be "devastating" and have "catastrophic

consequences."  Pl. Mot. at 9–11.  This Court, Plaintiffs volunteer, should take it upon itself to

"exercise [its] equitable discretion to balance the probability and the consequences of harm on

the facts of" the case before it.  Id. at 11.  Such invitation notwithstanding, the Court must take

the law as it finds it.  And the law requires that irreparable injury be "likely in the absence of an

injunction," Winter, 555 U.S. at 22, and "of such imminence that there is a clear and present

need for equitable relief to prevent" it.  Chaplaincy of Full Gospel Churches, 454 F.3d at 297

(quoting Wis. Gas., 758 F.2d at 674) (cleaned up).  The D.C. Circuit has provided no exception

to these longstanding principles for harms that are of remote possibility but of great potential

effect.  Indeed, in an earlier stage of the present litigation, the Court spoke to this very issue:

> Although the potential injury may be significant, the Tribe must
> show that it is probable to occur in the absence of the preliminary
> injunction it now seeks. . . .  This is the burden the law imposes for
> this form of relief.  The Court must faithfully and fairly apply that
> standard in all cases, regardless of how high the stakes or how
> worthy the cause.

Standing Rock I, 205 F. Supp. 3d at 33–34 (citing Winter, 555 U.S. at 22).  So too here.  See

Sierra Club, 990 F. Supp. 2d at 41 & n.18 (notwithstanding plaintiff's argument that pipeline

operation "risks a devastating oil spill that would be damaging to nearby communities" and

"threaten [their] survival," no irreparable harm because plaintiffs "have not shown that a

damaging oil spill is likely to occur") (citation omitted); Nat. Res. Def. Council v. Kempthorne,

525 F. Supp. 2d 115, 126 (D.D.C. 2007) (deeming irreparable harm not "likely" given its remote chance of occurring, even though alleged potential harm was severe).

None of Plaintiffs' cited cases from this district finding a likelihood of irreparable harm remotely suggests otherwise. See, e.g., Nat'l Ass'n of the Deaf v. Trump, 486 F. Supp. 3d 45, 58 (D.D.C. 2020) ("little debate" that irreparable harm established where plaintiffs were denied access to critical health information in midst of COVID-19 pandemic, thus hampering their ability to protect themselves against virus that had already infected millions); Brady, 612 F. Supp. 2d at 25 (finding likelihood of irreparable harm given "almost universal view" that agency action "will have some environmental impacts," even if "extent" of such harm was "not fully known"); Ctr. for Biological Diversity, 480 F. Supp. 3d at 251–52 (deploying "probabilistic reasoning" to determine that irreparable injury was "likely" in absence of injunction). Nor does their non-binding, out-of-circuit precedent move the ball. See, e.g., Michigan v. U.S. Army Corps of Eng'rs, 667 F.3d 765, 785–86, 789 (7th Cir. 2011) (irreparable harm would "likely . . . come to pass" where invasive carp were already "knocking on the door" to Great Lakes, where carp had demonstrated ability to "dominate" ecosystems, and where threat "may be increasing with each day that passes"); Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1258 (10th Cir. 2003) (pre-Winter case requiring only "significant risk" of irreparable harm); Van De Sande v. Van De Sande, 431 F.3d 567, 568–70 (7th Cir. 2005) (Hague Convention case unrelated to irreparable harm). At bottom, the Tribes have not put forth a single case involving an improbable and remote future harm — let alone of the degree present here — that somehow satisfied the irreparable-injury requirement on account of its great potential magnitude.

To be sure, the concept of irreparable harm "does not readily lend itself to definition." Wis. Gas, 758 F.2d at 674. The Court does not gainsay that the extent or severity of a potential

future harm may factor into the irreparable-injury calculus.  Neither does it hold that a plaintiff cannot establish irreparable harm absent a "specific finding that the threatened harm was more likely than not."  Pl. Reply at 14.  Indeed, it readily acknowledges that courts have found the requirement satisfied without undertaking a "statistical analysis to calculate the precise likelihood" of future injury.  See Pl. Mot. at 12.  The Court does not purport to know the precise probability of a damaging, irremediable oil spill at Lake Oahe.  What it does know, however, is that the law requires the Tribes to make a "clear showing" that such harm is at least "likely" in the absence of an injunction.  Winter, 555 U.S. at 22; see also Monsanto, 561 U.S. at 162 (requiring "present or imminent risk of likely irreparable harm").  While the concept of "likelihood" may blur around the edges in certain hypothetical applications, the above discussion renders abundantly plain that — at least at present — Plaintiffs have not come close to discharging this burden.  All they have shown, rather, is a mere "possibility" of injury — and a fairly minimal one at that.  This cannot get them over the hump.  No matter the stakes and no matter the cause, courts may not grant the "extraordinary remedy" of an injunction "based only on a possibility of irreparable harm."  Winter, 555 U.S. at 22.

### 2.  *Other Claimed Harms*

Apart from the risk of a damaging oil spill, the Tribes assert two other harms that require somewhat less discussion.  They maintain that they are irreparably injured by "the ongoing trauma of the government's refusal to comply with the law," as well as the "undermining [of] the Tribes' sovereign governmental role to protect their members and respond to potential disasters."  Pl. Mot. at 1, 14–18.  Neither tack finds the wind.

The problem with both is simple: they depend on the same remote threat of a pipeline spill that the Court has just found insufficient to constitute irreparable injury.  Consider the first.

According to Plaintiffs, they are irreparably injured from "the impacts of living under the existential threat of a pipeline [oil spill]" in the form of "anxiety, trauma, and stress." Id. at 15. In the words of the Cheyenne River Sioux Tribe's historic preservation officer, such emotional harms stem from the "looming threat of seepage, leak, and rupture," which "inflicts ceaseless anxiety upon us that will not end until the pipeline is removed." Id. (quoting ECF No. 527-10 (Declaration of Steve Vance), ¶ 17); see also id. (arguing that Tribes' "sense of safety is compromised by the operation of the pipeline"); id. at 16 (referencing "stress of living under an existential catastrophe"). The Court does not doubt the sincerity of these feelings. As Judge Jackson explained in Sierra Club, however, the fact that "some of the people who live in areas near the pipeline . . . are sincerely worried about the harm that an oil spill might cause" does not constitute irreparable harm absent a showing that "a damaging oil spill is likely to occur." 990 F. Supp. 2d at 41; see also Wis. Gas, 758 F.2d at 674 ("Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time.") (citation and internal quotation marks omitted). As no damaging, irremediable spill at Lake Oahe is likely to occur here, the Tribes cannot establish irreparable injury simply by raising their fear of a hypothetical future spill. Were it otherwise, the irreparable-harm bar would not be much of a bar at all.

Plaintiffs' reliance on Fund for Animals v. Norton, 281 F. Supp. 2d 209 (D.D.C. 2003), is misplaced for the same reason. There, the plaintiffs made a showing of irreparable injury based in part on emotional distress from their contemplation of the government's impending killing of hundreds of swans. Id. at 221–22. As multiple courts have subsequently explained, however, when the risk of the feared harm from the agency action in question is "low," plaintiffs cannot claim irreparable injury from any "emotional distress" surrounding the prospect of that speculative harm. See Colo. Wild Horse, 130 F. Supp. 3d at 220 (distinguishing Fund for

25

Animals); see also Friends of Animals v. U.S. Bureau of Land Mgmt., 232 F. Supp. 3d 53, 66

(D.D.C. 2017) ("Plaintiff's observation or contemplation of the possible — though unlikely —

physical harm that [animals] may suffer [from agency action] does not rise to the level of a

'certain and great' irreparable injury.") (quoting Wis. Gas, 758 F.2d at 674); Manzanita Band,

496 F. Supp. 3d at 267 ("The [Tribe] only cite[s] . . . concerns and fears about the Projects' effect

on the sacred sites, not any evidence that injuries are likely to occur.  While sincere, [these]

sentiments do not meet the required showing for a preliminary injunction.") (citation omitted).

That principle controls here: the Tribes' anxiety and trauma regarding a hypothetical damaging

spill at Lake Oahe do not constitute irreparable harm where they have not demonstrated a

likelihood of any such spill.

Plaintiffs adopt a slightly different approach in their Reply brief, more directly

emphasizing a related, but ultimately distinct, type of emotional injury.  Specifically, they claim

that "allowing the pipeline to continue operating despite a serious NEPA violation is part of a

pattern" of "'historic trauma'" experienced by "'every Tribal member,'" one deriving from the

government's "continued refusal to respect the rights of the Tribes throughout the nation's

history" and its "prioritizing non-Indians" at the expense of Tribal members.  See Pl. Reply at 17

(cleaned up) (quoting ECF No. 569-5 (Fourth Declaration of John Eagle, Sr.), ¶ 13).  The Court

does not deny that shameful past.  On the contrary, it fully acknowledges and appreciates the

"tragic history of the Great Sioux Nation's repeated dispossessions at the hands of a hungry and

expanding early America," along with the persistent "threat that new injury will compound old."

Standing Rock I, 205 F. Supp. 3d at 33.  Plaintiffs' argument based on ongoing, compounding

historical trauma, however, does not qualify as irreparable harm within the context of this case.

The Tribes, critically, never explain how their asserted trauma — at least as it pertains to the pipeline — exists independent of the threat of an oil spill. In other words, the issue is not the mere existence of a buried pipe or the flow of oil within it. The culprits, rather, are the risk of a spill that inevitably accompanies the pipeline's operation and Plaintiffs' belief that the Government has forced them to bear that risk for the benefit of non-Tribal interests. See Pl. Reply at 17 (referencing "compounding impact of prioritizing non-Indians who privatize benefits but socialize risks on the backs of the Tribes"); Eagle 4th Decl., ¶ 13 (discussing, in context of "historic trauma," pain caused by fact that pipeline "gets to keep operating, exposing us to risk and stress of catastrophe"). Once more, then, this variant of the Tribes' earlier trauma-based arguments cannot be meaningfully disentangled from the remote threat of an oil spill at Lake Oahe that does not independently constitute irreparable harm. Nor do Plaintiffs explain how shutting down the pipeline would remedy these "longstanding," deep-rooted feelings stemming from the "continued refusal to respect the rights of the Tribes throughout the nation's history." Pl. Reply at 17; see Standing Rock I, 205 F. Supp. 3d at 34 (finding no irreparable harm where harm was "destined to ensue whether or not the Court grants the injunction the Tribe desires"); Wis. Gas, 758 F.2d at 674 (explaining that party seeking injunction "must show that the alleged harm will directly result from the action which [it] seeks to enjoin") (emphasis added).

Plaintiffs' second claimed harm founders for similar reasons as the first. According to the Tribes, "[T]he Corps' NEPA violations have undermined [their] sovereign governmental role to protect their citizens, respond to disasters, and mitigate harm." Pl. Mot. at 16–17. It soon becomes clear, however, that these governance-based harms are once again derivative of the same speculative spill-risk harms handled above. See Pl. Reply at 18 ("[A]ny mistake by the Corps or DAPL immediately would become the Tribe's problem, impact its core functions, and

threaten the citizens whom the Tribe is responsible for."); id. (arguing that "a spill would immediately and indisputably interfere with the Tribe's sovereignty over its land"); Pl. Mot. at 18 (referencing potential spill hindering ability of Tribe to protect "sacred and ceremonial sites that would be at risk"); id. (discussing challenges in "spill response planning" and guarding against "risks and impacts" of potential spill). To the extent the Tribes assert injury arising from the process of "planning for" a potential pipeline leak and the "scarce resources" they devote thereto, see Pl. Reply at 18, moreover, such "present costs and burdens" stemming from a course undertaken to guard against a "speculative threat" cannot form the basis for irreparable harm. See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013) (rejecting similar argument in Article III injury-in-fact context). Finally, DAPL itself does not implicate any "loss of sovereignty over Tribal land," Pl. Mot. at 17, as the Lake Oahe segment traverses only federal property. Standing Rock III, 255 F. Supp. 3d at 114.

* * *

As the Tribes have not carried their burden to demonstrate a likelihood of irreparable injury absent an injunction, the Court must deny them the relief they seek. It does not reach that conclusion lightly. Fully aware of the unshakable indignities visited upon the Tribes across generations, the Court, as it has throughout this litigation, scrutinizes the record with care. It likewise acknowledges the quandary in which Plaintiffs find themselves and the undeniable frustration that comes with it — namely, having achieved (and successfully defended on appeal) the vacatur of a key pipeline easement, they must now turn around and make an even steeper showing to obtain the injunctive relief necessary to stop the flow of oil. As the preceding discussion demonstrates, establishing the harm necessary to earn this relief in circumstances such as the present is a tall task indeed. Yet, where the Court of Appeals has required that the Tribes

put forth a particular showing before securing any order shutting down the pipeline, this Court must hold them to that showing, no matter how lofty the bar.

The Court closes this analysis where it began: with the Corps.  Plaintiffs, no doubt, will wish that the Court's Opinion today had come out differently.  Simply by ruling, however, the Court has at least given them something the Corps has not: a decision.  Notwithstanding repeated instruction from this Court and the D.C. Circuit to "decide promptly" and "in the first instance" how it "will enforce its property rights" *vis-à-vis* the pipeline's encroaching on federal land at Lake Oahe, the Corps has not yet issued any determination on the matter at all — more than ten months since the invalidation of the underlying easement.  Standing Rock IX, 985 F.3d at 1054. Much like the Circuit, this Court presently "ha[s] no occasion to consider" whether, by way of such inaction, the Corps has effectively granted "a *de facto* outgrant without engaging in the NEPA analysis that the Corps concedes such an action requires."  Id.  For now, it suffices to note that by ducking the controversy surrounding the Oahe crossing, the Corps actively tolerates DAPL's continued operation underneath a key federal waterway that it lacks the necessary authorization to traverse.  That, of course, is a political decision outside this Court's area of inquiry.  Whether the Corps formally acknowledges such decision or not, this is the outcome it now owns.

C.  Section 408 Permit

One final issue merits mention.  Although the majority of the Tribes' opening brief concerns their bid for injunctive relief, a single paragraph requests something entirely different — to wit, "clarification" from the Court that its vacatur order from last July was not limited to the Mineral Leasing Act easement but also included the permit issued under Section 408 of the Rivers and Harbors Act.  See Pl. Mot. at 6–7.  As a reminder, Dakota Access was required to —

29

and in July 2016 did — obtain such permit, which authorized it to lay the pipeline underneath

Lake Oahe.  See Standing Rock III, 255 F. Supp. 3d at 114, 116; 33 U.S.C. § 408(a) (making it

unlawful to alter or make use of certain public works absent determination that occupation will

not impair their usefulness or be injurious to public interest); Section 408 Decision Package at

ECF pp. 3–4, 6–7.  While the Court last year vacated the MLA easement pending the Corps'

completion of an EIS, it said nothing in either its summary-judgment or vacatur Opinion about

the status of the separate Section 408 permit (which the Tribes now maintain "indisputably relied

on the invalidated environmental assessment" and thus cannot stand).  See Pl. Mot. at 6–7.

It quickly becomes clear why Plaintiffs request this additional "clarification."  According

to them, "[V]acatur of the § 408 regulatory authorization would mean the pipeline could not

continue operations," thus excusing them from the need to satisfy the traditional injunction

criteria before obtaining such relief.  Id. at 7.  Nowhere across their briefing, however, do they

begin to explain why vacatur of the Section 408 permit would yield that result.  Indeed, the

opposite appears true.  As the Government clarifies, "[T]here is no federal permit required to

operate a crude oil pipeline," nor does the Corps regulate such operation.  See Corps Opp. at 4;

see also Federal Appellant's Reply Brief at 15 & n.3 (D.C. Cir. Sept. 30, 2020) (explaining that

Dakota Access "do[es] not need a permit or license from the Corps to operate [DAPL] because

the Corps does not regulate the operation of oil pipelines" and contrasting natural-gas pipelines,

operation of which is regulated by federal agency); DA Opp. at 24 (noting that "oil pipelines

need no federal license to operate").  The Section 408 permit, rather — much like the MLA

easement — simply denotes the Corps' approval of Dakota Access's plans to site the pipeline on

federal property, thereby altering the prior federal design.  See Section 408 Decision Package at

ECF pp. 3–4, 6–7.  It follows that any potential vacatur of such permit — again like the easement

— could not by itself bring about a shutdown in pipeline operations.  See <u>Standing Rock IX</u>, 985 F.3d at 1054 (holding that mere vacatur of DAPL's federal authorization to cross government property could not itself stop flow of oil absent independent findings necessary for injunctive relief).

As the Tribes have offered no grounds for concluding that vacatur of the Section 408 permit would put them in a different place from where they are now — *i.e.*, in need of an injunction to close the pipeline — the Court declines to entertain their alternative bid to expand its prior order.  That course seems all the more prudent in the absence of more dedicated briefing exploring precisely how this Court's summary-judgment and vacatur Opinions bear on Plaintiffs' request.

## III.    Conclusion

For the aforementioned reasons, the Court will deny Plaintiffs' Motion for Clarification and a Permanent Injunction.  A separate Order so stating will issue this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>May 21, 2021</u>